**PUBLISHED**

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

KIMBERLY LAING,

      *Plaintiff-Appellant,*

      v.

FEDERAL EXPRESS CORPORATION,

      *Defendant-Appellee.*

No. 11-2116

Appeal from the United States District Court
for the Western District of North Carolina, at Charlotte.
Graham C. Mullen, Senior District Judge.
(3:10-cv-00242-GCM)

Argued: October 26, 2012

Decided: January 9, 2013

Before WILKINSON, KING, and SHEDD, Circuit Judges.

---

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge King and Judge Shedd joined.

---

**COUNSEL**

**ARGUED:** Jenny Lu Sharpe, SHARPE LAW OFFICE, Charlotte, North Carolina, for Appellant. Melissa Kimberly Hodges, FEDERAL EXPRESS CORPORATION, Memphis, Tennessee, for Appellee. **ON BRIEF:** Tamara W. Brooks,

BROOKS LAW OFFICE, Charlotte, North Carolina, for Appellant.

---

**OPINION**

WILKINSON, Circuit Judge:

Appellant Kimberly Laing claims that Federal Express Corporation ("FedEx") violated the Family Medical Leave Act ("FMLA"), 29 U.S.C. § 2601 *et seq.*, by terminating her employment in retaliation for her decision to take medical leave and by failing to restore her to an equivalent position upon her return from leave. The district court granted FedEx's motion for summary judgment, dismissing both claims. Because Laing fails to point to any evidence that FedEx treated similarly situated employees who had not taken FMLA leave more favorably, and because the record shows that FedEx would have suspended and terminated her employment regardless of her decision to take leave, we affirm the judgment.

I.

Laing worked for FedEx as a mail courier in Charlotte, North Carolina, from June 4, 1988, until June 30, 2009, when her employment was terminated. The facts that follow describe the circumstances leading to her termination. Because the district court awarded summary judgment to FedEx, we view the evidence and draw reasonable inferences in the light most favorable to Laing. *See Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150-51 (2000).

A.

On March 17, 2008, Laing was making a residential delivery for FedEx when she fell on uneven pavement and landed

hard on her knees. The fall left her knees swollen for weeks and made it difficult to walk without a limp. After physical therapy did little to improve her condition, an MRI and a subsequent visit with an orthopedic specialist revealed that Laing's right knee had suffered significant damage. In December 2008, the orthopedic specialist wrote a note ordering surgery on Laing's knee, which Laing provided to her supervisor, Carolyn Scott.

In mid-February 2009, some two months after being notified that Laing would need surgery (but before Laing scheduled her surgery or applied for FMLA leave), Scott became concerned with Laing's job performance. Specifically, while reviewing Laing's route trace reports in an effort to increase her efficiency, Scott found evidence that Laing may have been falsifying her delivery records in two distinct ways. First, Scott noticed entries in Laing's route reports indicating that she had made deliveries to "two different addresses at the exact same time." Second, Scott found evidence that Laing may have been "gaining time," a term used by FedEx to describe deceptive acts such as making multiple stops to one address to deliver multiple packages (rather than delivering the packages all at one time) in order to artificially enhance the courier's pay or performance.

Scott took this evidence to her boss, Wade Dark, who directed her to bring it to the company's Human Resources Manager, Gregg Taylor. After examining Laing's route reports, Taylor instructed Scott to commence an investigation by going on check-rides with Laing and reviewing her delivery records for suspicious activity over the next thirty days. Before Scott could conclude the investigation, however, Laing received a phone call from her doctor on March 15, 2009, scheduling her knee surgery for March 23. Laing then applied for FMLA leave for the surgery, which was granted on March 19, 2009.

Laing became concerned, however, that she might lose her delivery route or her job while on leave. She expressed this

concern to a FedEx Operations Manager, Donnie Hicks, on March 17, 2009, asking whether her medical leave would "be a problem." According to Laing, Hicks replied, "well, we'll do our best to keep your job open for you," to which Laing said, "Donnie, you know, with FMLA, you have to keep my job open for me." Hicks then answered, "That's not necessarily the case. You don't know how it works."

With her concerns still unresolved, Laing testified that on her final day at work before her leave, she asked another of the office's Operations Managers, Matt Bass, to "look out for me while I'm out." Bass then responded, "Oh, Kim, we're going to do everything we can to get rid of your route while you're gone." Laing states that Bass laughed after he made this comment and added, "Oh, I'm just kidding." Nonetheless, Laing says that she did not believe Bass was only kidding.

Laing also states that she called the station during her leave and was informed that Hicks, not Scott, was to be her new supervisor. Laing then spoke with Hicks, who informed her that he had dissolved her regular route and replaced it with a part-time route. Laing responded by complaining to a FedEx Human Capital Manager, Stan Tolliver, who assured her that her original route would be reinstated when she returned from leave. Laing says she also spoke with Carolyn Scott on the evening before her return to work and that Scott informed her that she would "run [he]r same route, as [she] always ha[d]."

Nevertheless, when Laing returned to work on June 4, 2009, Scott asked Laing to come into her office. By this point, the company had finished its investigation into her delivery records, reaching the conclusion that Laing had engaged in a pattern of records falsification by both "padding stops" (a phrase used interchangeably with "gaining time") and by claiming to make multiple simultaneous deliveries to different addresses miles apart. With respect to the simultaneous deliveries in particular, Scott consulted MapQuest and determined that given the distance between the addresses identified in

Laing's reports, there was no way Laing could have made the deliveries at the times indicated. Accordingly, Scott told Laing that she would be placed on an investigatory suspension.

Although Scott disputes this portion of Laing's testimony, Laing claims that Scott was "noticeably crying" during this conversation. Laing also claims that she asked, "Carolyn, do you think that I padded my stops?" According to Laing, Scott replied, "No, I don't. But they're making me do this. Donnie is making me do this." Scott then insisted that Laing write a statement responding to the charges, although Laing says she was forbidden from seeing the records that were the basis of the accusations. Laing received full pay while she was suspended.

FedEx terminated Laing's employment on June 30, 2009. The official termination letter stated as follows:

> Our investigation found a demonstrated pattern of gaining time . . . . On 3/3/09, records show a gain of 26 minutes for one stop. There were four more examples of returning to the same stops, entering a [code stating that a package could not be delivered] and then a [code stating that a package was delivered] or a number of [such successful delivery codes] for the same stop. Similar patterns surfaced on 3/04/09, 3/05/09, 3/06/09, 3/09/09, 3/10/09 (at 3 different stops at the same time), 3/11/09, 3/13/09 (gained 19 minutes) . . . 3/17/09 (two stops 1 minute apart, MAPQUEST noted it takes 7 minutes of drive time), 3/18/09 (gained 22 minutes for one stop, two stops 1 minute apart, MAPQUEST noted it takes 6 minutes of drive time) . . . .

> As a result of the investigation, it has been determined that you violated the Acceptable Conduct Policy 2-5 by falsifying your electronic record. . . .

> Based on these findings, your employment with Fed-
> eral Express is terminated, effective June 30th, 2009.

There is no dispute that Laing was aware of the Acceptable Conduct Policy, which provides for the discharge of an employee who engages in "deliberate falsification of . . . delivery records." In fact, FedEx had terminated Laing for violating the same policy in 2005, though that decision was later overturned during FedEx's internal appeals process. And although Laing also sought to overturn her June 2009 discharge through FedEx's appeals process, that effort ultimately proved unsuccessful.

B.

In April 2010, Laing filed suit in state court alleging various violations of the FMLA and North Carolina law. FedEx removed the case to the U.S. District Court for the Western District of North Carolina.

As relevant to this appeal, Laing alleged that FedEx discharged her in retaliation for taking FMLA leave, in violation of 29 U.S.C. § 2615(a)(2), which makes it unlawful for "any employer to discharge or in any other manner discriminate against any individual for opposing any practice made unlawful by this chapter." Laing also claimed that FedEx violated 29 U.S.C. § 2615(a)(1), which prohibits employers from "interfer[ing] with, restrain[ing], or deny[ing] the exercise of" any right provided by the FMLA. Specifically, Laing contended that FedEx denied her right under 29 U.S.C. § 2614(a)(1) to be restored to either the same position she held prior to her leave or to an "equivalent position."

The district court granted summary judgment to FedEx on both claims. With respect to the retaliatory discharge claim, the court held that although Laing had established a prima facie case of discrimination, she "failed to show that Defendant FedEx's reasons for termination are pretextual." J.A. at

1352. In particular, the court noted that FedEx provided "voluminous evidence through the [route] reports of what [FedEx] considers to be termination-worthy falsification of company records." *Id.* While Laing "provide[d] explanations for why" she believed her delivery records were "unusual," she did not dispute that her records were "in fact unacceptable under company policy." *Id.* The court thus held that Laing had failed to create a "genuine dispute over whether she was terminated for exercising her FMLA rights." *Id.* at 1353. Notably, the court did not discuss whether discriminatory motive could be inferred on the basis of similarly situated FedEx employees who received differential treatment because Laing did not identify any such comparator evidence in her opposition to summary judgment.

The district court also held that FedEx had not denied Laing's right to be restored to an equivalent position. *Id.* at 1347. The court noted that FedEx placed Laing on investigatory suspension on the very morning that she returned from leave. *Id.* at 1343. But the court ruled that this did not create a triable issue on Laing's equivalent position claim because she was classified as a full-time employee and received full-time pay until her termination. *Id.* at 1348.

Laing then filed this appeal, challenging the district court's grant of summary judgment on the aforementioned claims.

## II.

Laing's principal argument on appeal is that FedEx violated the FMLA when it retaliated against her by suspending and discharging her for taking medical leave. *See* 29 U.S.C. § 2615(a); *see also* 29 C.F.R. § 825.220(c) ("[E]mployers cannot use the taking of FMLA leave as a negative factor in employment actions."). FMLA retaliation claims are analogous to discrimination claims brought under Title VII. *Yashenko v. Harrah's N.C. Casino Co.*, 446 F.3d 541, 551 (4th Cir. 2006). Thus, a plaintiff may succeed either by providing

direct evidence of discrimination or by satisfying the burden-shifting framework set forth in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Diamond v. Colonial Life & Accident Ins. Co.*, 416 F.3d 310, 318 n.4 (4th Cir. 2005). Laing contends that her claim should survive summary judgment under both approaches, so we consider each in turn.

Laing argues first that summary judgment was inappropriate because she introduced direct evidence that FedEx discriminated against her for taking protected FMLA leave. Direct evidence encompasses "conduct or statements" that both (1) "reflect directly the alleged discriminatory attitude," and (2) "bear directly on the contested employment decision." *Warch v. Ohio Cas. Ins. Co.*, 435 F.3d 510, 520 (4th Cir. 2006) (internal quotation marks omitted).

Laing first points to a purported conversation she had with Operations Manager Donnie Hicks. She contends that Hicks directly displayed a discriminatory attitude when, upon being asked whether Laing's FMLA leave would be a problem, he responded, "Well, we'll do our best to keep your job open for you." Then, when Laing told Hicks that he "ha[d] to keep [her] job open" under the FMLA, Laing states that Hicks replied, "That's not necessarily the case. You don't know how it works."

We do not see how a reasonable jury could construe these comments to be evidence of a discriminatory attitude. Hicks's response to Laing's question—"we'll do our best to keep your job open for you"—hardly indicates animus against her FMLA leave. If anything, it suggests exactly the opposite. Nor did Hicks demonstrate a discriminatory attitude when he accurately explained that the FMLA did not "necessarily" require the company to keep Laing's job open. As we held in *Yashenko*, the FMLA does not provide employees with "an absolute right to restoration . . . rather, an employer may deny restoration when it can show that it would have discharged the

employee in any event regardless of the leave." 446 F.3d at 548.

Laing next points to a comment made by another Operations Manager, Matt Bass. Laing states that after she asked Bass to "look out for me while I'm out" on leave, Bass laughingly responded, "Oh, Kim, we're going to do everything we can to get rid of your route while you're gone." Laing acknowledges that Bass added, "Oh, I'm just kidding," after making this comment, but she insists that she did not believe the statement was only a joke.

To begin with, there is a danger in allowing law to squeeze all informality from workplace interactions: every offhand expression of attempted humor need not plant the seed for a discrimination suit. While some such remarks may be hurtful and decidedly not funny, neither should a worksite become a dour place to be. In any event, even if a reasonable jury would credit Laing's belief that Bass's statement was not a joke, we conclude that it would not find Bass's comment to be direct evidence of discriminatory animus. The comment did not reflect a discriminatory attitude—that is, Bass never suggested that Laing's route might be changed because she was taking FMLA leave, rather than for some other, lawful reason. Indeed, Laing herself testified that during her twenty-one years at the station, delivery routes were changed frequently due to evolving operational needs, that her own route had accordingly changed several times, and that she had personally assisted in efforts to reallocate delivery routes. To say this sort of passing and lighthearted comment serves as direct evidence of discrimination would require us to impart to it a sinister character that Laing's own description appears to belie.[1]

---

[1]Nor does Carolyn Scott's disputed statement that "Donnie [Hicks] is making me do this" provide the slightest indication that the reason why Hicks was asking Scott to suspend Laing was due to her FMLA leave as opposed to some other lawful reason, namely her deliberate falsification of delivery records. Neither can it be said that Station Manager Wade

### III.

Without the benefit of direct evidence to support her claim, Laing next seeks to rely on circumstantial evidence under the *McDonnell Douglas* burden-shifting framework, 411 U.S. at 802-04. *See also St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506-07 (1993); *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252-53 (1981). We discuss at the outset one of the most salient aspects of that framework—comparator evidence—before applying the framework to Laing's case.

### A.

Ever since the Supreme Court's watershed decision in *McDonnell Douglas*, courts have considered comparator evidence to be a particularly probative means for discerning whether a given adverse action was the product of a discriminatory motive. *McDonnell Douglas*, of course, set forth the evidentiary burden-shifting framework that has become in large measure a judicial playbook for evaluating discrimination claims. Under that framework, the initial burden rests on the plaintiff to make out a prima facie case of discrimination. 411 U.S. at 802. If the plaintiff does so, the burden shifts to the employer to articulate a nondiscriminatory reason for its action. *Id.* The plaintiff is then afforded an opportunity to prove that the employer's explanation "was in fact pretext." *Id.* at 804. And it is at this third step that *McDonnell Douglas* identified the significance of comparator evidence: the Court explained that "especially relevant" to a showing of pretext would be evidence that other employees who were similarly situated to the plaintiff (but for the protected characteristic) were treated more favorably. *Id.*

---

Dark's concern about Laing's workday therapy sessions interfering with her productivity bore on FedEx's decision to terminate her. Any such innocuous statement was made nearly a year before Laing even took her FMLA leave for her surgery and more than a year before FedEx's decision to terminate her.

Heeding this instruction, federal courts now routinely rely on comparator evidence when deciding whether an adverse employment action was driven by a discriminatory motive. *See, e.g.*, *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008); *Waterhouse v. District of Columbia*, 298 F.3d 989, 995-96 (D.C. Cir. 2002); *Kendrick v. Penske Transp. Servs.*, 220 F.3d 1220, 1232-34 (10th Cir. 2000). One commentator has gone so far as to observe that comparator evidence has become a "defining element of discrimination law." Suzanne B. Goldberg, *Discrimination by Comparison*, 120 Yale L.J. 728, 750 (2011).

That comparator evidence should prove especially useful in discrimination cases makes sense for several reasons. To start, the very term "discrimination" invokes the notion of treating two persons differently on the basis of a certain characteristic that only one possesses. One dictionary, for instance, defines "discrimination" to mean "treatment or consideration of, or making a distinction in favor of or against, a person or thing based on the group, class, or category to which that person or thing belongs." *Random House Dictionary of the English Language* 564 (2d ed. 1987). Thus, "the ordinary interpretation and meaning of the term [discrimination]" implies that a plaintiff has "'received differential treatment vis-á-vis members of a different group on the basis of a statutorily described characteristic.'" *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 611 (1999) (Kennedy, J., concurring) (quoting *id.* at 616 (Thomas, J., dissenting)). Conversely, similar treatment of similarly situated individuals is what anti-discrimination statutes aspire to achieve.

Reliance on comparator evidence is also sensible for functional reasons. That is to say, the task of identifying whether an employer has treated more favorably a person who is situated similarly to the plaintiff (but for the characteristic at issue) is a relatively straightforward and manageable inquiry. But the same might not be said for other modes of proof. *See* Charles A. Sullivan, *The Phoenix from the Ash: Proving Dis-*

*crimination by Comparators*, 60 Ala. L. Rev. 191, 192 (2009) (describing comparator evidence as a "simpler, more direct method of establishing discrimination"). Consider, for example, the complexity of the evidence approved by the Supreme Court in *Oncale v. Sundowner Offshore Services, Inc.*, which held that in the context of sex discrimination claims based on sexual harassment (where comparator evidence is not paramount), a decision should be based on "all the circumstances," including the "constellation of surrounding circumstances, expectations, and relationships which are not fully captured by a simple recitation of the words used or the physical acts performed." 523 U.S. 75, 81-82 (1998) (internal quotation marks omitted).

Moreover, unlike a free-form evaluation of the "constellation" of contextual considerations that might inform whether a particular workplace decision was unlawfully motivated, comparator evidence is more objective in nature. *See* Goldberg, *supra*, at 794 (noting that comparator evidence has "an empirical cast to it—it documents, from facts, the different treatment and, by implication, the discriminatory intent"). Adjudicating discrimination claims based on comparator evidence thus mitigates the risk of judges inserting their own subjective value judgments in place of facts and settled law. The Supreme Court has recognized this concern, too, noting its approval in *County of Washington v. Gunther* of a discrimination claim that did "not require a court to make its own subjective assessment of the value of" certain male and female employees. 452 U.S. 161, 181 (1981).

This is not to say that comparator evidence is the final answer in discrimination law. Disputes abound as to who is a valid comparator and who is not. And notwithstanding the virtues of comparator evidence, it of course remains the case that a plaintiff is "not required as a matter of law to point to a similarly situated . . . comparator in order to succeed" on a discrimination claim. *Bryant v. Aiken Reg'l Med. Ctrs., Inc.*, 333 F.3d 536, 545 (4th Cir. 2003). But the fact remains that

such evidence has a useful place. In cases where an employer adduces a nondiscriminatory reason for discharging the plaintiff and comparator evidence does not exist to rebut that explanation, the plaintiff must be able to point persuasively to some other form of evidence demonstrating that the employer's explanation was a mere pretext for discrimination. With this in mind, we turn to the evidence presented in this case.

### B.

At the first step of the *McDonnell Douglas* framework, Laing argues that she has met her prima facie burden of showing that (1) she engaged in a protected activity; (2) FedEx took adverse action against her; and (3) a causal nexus exists between the protected activity and the adverse action. *See Yashenko*, 446 F.3d at 551. We agree. With regard to the first two prongs, there is no dispute that Laing engaged in protected activity when she took FMLA leave and that FedEx took adverse action by suspending and terminating her employment. With respect to the third prong, the close temporal proximity between the two—Laing was suspended on the morning of her return from medical leave and terminated within the month—is sufficient to establish the requisite causal nexus. *See id.*

Because Laing established her prima facie case, the burden shifts to FedEx to articulate a "legitimate, nondiscriminatory reason for" suspending and terminating her. *McDonnell Douglas*, 411 U.S. at 802. We conclude that this burden has been satisfied, too, as FedEx has explained that Laing was suspended and terminated due to her repeated violation of the company's "zero-tolerance" Acceptable Conduct Policy. As the company's termination letter indicates, Laing was discharged on the basis of an investigation that concluded that she had engaged in a "demonstrated pattern" of falsifying records. The letter identified numerous instances in which Laing "gained time" or "padded stops" by, for example, stopping at a location and entering a code stating that no delivery

could be made, only to return soon after and enter a code stating that a delivery was completed. The letter also noted several instances in which Laing falsified records by claiming to make multiple deliveries to locations miles apart from one another at the same time. There is no dispute that such conduct is prohibited by FedEx's Acceptable Conduct Policy. Moreover, it is further undisputed that Laing was aware of the Acceptable Conduct Policy and that violations of the policy are punishable by termination. It is hard to see how it could be otherwise, for the honest reporting of deliveries goes to the heart of FedEx's entire business enterprise.

Faced with this nondiscriminatory explanation for her termination, Laing bears the burden of establishing at step three of the *McDonnell Douglas* framework that FedEx's "proffered explanation is pretext for FMLA retaliation." *Nichols v. Ashland Hosp. Corp.*, 251 F.3d 496, 502 (4th Cir. 2001). Laing has not satisfied this burden. Significantly, Laing has not identified any similarly situated FedEx employee—that is, an employee accused of violating the same company policy but who did not take FMLA leave—who was given more favorable treatment. Such comparator evidence, of course, would be "especially relevant" to a showing of pretext, but Laing has none. *McDonnell Douglas*, 411 U.S. at 804.

In fact, the only comparator evidence in the record supports *FedEx's* nondiscriminatory explanation for why it terminated Laing. In September 2008, just five months before the investigation into Laing's activity commenced and nine months before Laing's termination, Station Manager Wade Dark and Human Resources Manager Gregg Taylor (both of whom were involved in Laing's discharge) fired another employee, James Lawton, for violating the same company policy even though Lawton had not taken FMLA leave. Like Laing, Lawton was found to have falsified his delivery records by claiming to deliver packages to different addresses miles apart at the exact same time and by delivering multiple packages to the same address at different times instead of delivering them

all at once. And the record shows that FedEx treated Lawton and Laing virtually identically: FedEx investigated both by reviewing their route reports and MapQuest maps for suspicious activity. Once it became clear that the reports revealed a pattern of falsification, both were placed on investigative suspension with pay and given an opportunity to submit a written statement; and both were afforded the chance to use FedEx's internal appeals process after they were terminated.

Without comparator evidence to support her cause, Laing's principal argument that FedEx's stated reason for terminating her was pretextual is that she "presented a plausible explanation for each of the deliveries FedEx alleged were indicative of falsification." Specifically, Laing points to a declaration in which she offers an explanation for fifty-seven suspicious delivery stops that FedEx identified as evidence of falsification between March 3 and March 20, 2009. For example, in response to FedEx's accusation that she "gained 19 minutes" by making three separate deliveries to the same address between 2:05 pm and 2:24 pm on March 13, 2009, Laing argues that she did in fact make three deliveries at the listed times because each delivery involved a "large box" that had to be delivered separately "up a very steep driveway" into a locked building.

In offering her various explanations for the underlying conduct that led to her termination, however, Laing misunderstands the purpose of the pretext inquiry. "[W]hen an employer gives a legitimate, nondiscriminatory reason for discharging the plaintiff, it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." *Hawkins v. PepsiCo, Inc.*, 203 F.3d 274, 279 (4th Cir. 2000) (internal quotation marks omitted). In other words, in attempting to defend the conduct that led to her termination, all Laing has proven is the unexceptional fact that she disagrees with the outcome of FedEx's investigation. But such disagreement does not prove that FedEx's decision to fire her for falsifying

her records was "dishonest or not the real reason for her termination," which is what is required at step three of the burden-shifting framework. *Id.* at 280. While Laing contends that Carolyn Scott, her immediate supervisor, did not think that Laing's falsified delivery records were the real reason for her termination, the district court noted that Laing "never disputes that the suspicious [trace] reports are in fact unacceptable under company policy, but merely provides explanations for why her record is unusual." J.A. 1352.

To be clear, if FedEx's disciplinary action had been based on little evidence of wrongdoing, a genuine issue might exist as to pretext. But Laing does not even argue as much—she only claims that she has provided a "plausible" explanation for the numerous suspicious delivery records identified by FedEx. That is not enough to support a reasonable jury finding of pretext, however, as "we do not sit to appraise [FedEx's] appraisal" of the falsification evidence against Laing. *Hawkins*, 203 F.3d at 280. There is no genuine dispute that her delivery reports violated company policy, or that the company was somehow wrongly motivated in believing this to be the case.

Our disposition of this case is, at bottom, mindful of the Supreme Court's instruction that the "ultimate question" in any discrimination case is the existence of "discrimination *vel non.*" *U.S. Postal Serv. Bd. of Governors. v. Aikens*, 460 U.S. 711, 714 (1983). We have thus previously cautioned that courts should "resist the temptation to become so entwined in the intricacies of the proof scheme that they forget that the scheme exists solely to facilitate determination" of that ultimate question. *Proud v. Stone*, 945 F.2d 796, 798 (4th Cir. 1991).

Stepping back to answer the ultimate question in this case, we think it plain that Laing has failed to establish a "genuine, triable issue," *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986), as to whether FedEx discriminated against her. There

is considerable evidence that Laing violated a clearly communicated company policy forbidding delivery records falsification—a policy upon which FedEx's commercial viability depends. There is also considerable evidence that the company genuinely believed in this reason for terminating Laing. And perhaps most importantly, not only did Laing fail to adduce any comparator evidence in her favor, but the only comparator identified in the summary judgment record, James Lawton, was treated in the exact same manner as Laing after violating the exact same company policy in the exact same way—even though he did not take FMLA leave. Thus, the company investigated both Laing and Lawton by reviewing their route reports and MapQuest maps; placed both employees on investigative suspension; gave both employees an opportunity to write a written statement; and ultimately terminated both employees based on the evidence of document falsification. We therefore affirm the award of summary judgment in favor of FedEx on Laing's retaliation claim.

## IV.

Laing next contends that FedEx denied her right under the FMLA to be restored upon her return from leave to either the same position that she held before her leave or an equivalent one. *See* 29 U.S.C. § 2614(a)(1). Specifically, Laing argues that instead of restoring her to an equivalent position, FedEx suspended her employment, required her to surrender her company ID, and prohibited her from entering FedEx property.

We affirm the award of summary judgment in FedEx's favor on this claim, too, albeit under a different rationale than the one provided by the district court. The district court held that FedEx did not deny Laing's right to be restored to an equivalent position because even though she was suspended, Laing remained "a full time employee" and "received full time pay" until her termination. J.A. at 1348. But that reason-

ing is inconsistent with the plain text of the statute and the relevant regulation.

The FMLA entitles an employee to be restored to a position that is equivalent not just in terms of pay and full-time status, but also one that is equivalent in terms of "benefits . . . and other terms and conditions of employment." 29 U.S.C. § 2614(a)(1)(B). The applicable regulation, 29 C.F.R. § 825.215(a), clarifies that an "equivalent position" is one that is "virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status. It must involve the same or substantially similar duties and responsibilities." Whatever may be said about FedEx's decision to pay Laing at a full-time rate during her suspension, it cannot be said that her suspended status—during which she was stripped of all work responsibilities and prohibited from entering FedEx property—encompassed "terms and conditions of employment" equivalent to those which she enjoyed before her leave, much less "virtually identical . . . privileges [and] perquisites," and "substantially similar duties and responsibilities."

FedEx is nonetheless entitled to summary judgment on Laing's equivalent position claim because the FMLA does not afford Laing an "absolute right to restoration." *Yashenko*, 446 F.3d at 549. As we held in *Yashenko*, "the FMLA does not require an employee to be restored to his prior job after FMLA leave if he would have been discharged had he not taken leave." *Id.* at 547. The FMLA in fact provides that "[n]othing in this section shall be construed to entitle any restored employee to . . . any right, benefit, or position of employment other than [one] to which the employee would have been entitled had the employee not taken the leave." 29 U.S.C. § 2614(a)(3)(B); *see also* 29 C.F.R. § 825.216(a) ("An employee has no greater right to reinstatement . . . than if the employee had been continuously employed during the FMLA leave period."). In sum, the FMLA does not preclude an employer from placing an employee on an investigatory sus-

pension upon her return from medical leave if it would have taken the same action had the employee never taken leave in the first place.

Here, FedEx has introduced ample evidence that it would have suspended Laing based on her many violations of the company's falsification policy, regardless of whether she had taken FMLA leave. The investigation into Laing's misconduct (which led to her suspension) began in mid-February 2009, before she applied for FMLA leave on March 19. The evidence that the investigation uncovered—Laing's numerous instances of padding stops and claiming simultaneous deliveries to different addresses miles apart—has been canvassed earlier, and we see no need to repeat it here.

We accordingly affirm the district court's award of summary judgment to FedEx on Laing's equivalent position claim.

V.

For the foregoing reasons, the judgment of the district court is affirmed.

*AFFIRMED*