**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 15-1011**

VINCENT T. MERCER,

        Plaintiff – Appellant,

    v.

PHH CORPORATION,

        Defendant – Appellee.

Appeal from the United States District Court for the District of Maryland, at Baltimore. William D. Quarles, Jr., District Judge. (1:13-cv-00050-WDQ)

Argued: January 27, 2016        Decided: March 10, 2016

Before GREGORY, DUNCAN, and FLOYD, Circuit Judges.

Affirmed by unpublished opinion. Judge Duncan wrote the opinion, in which Judge Gregory and Judge Floyd joined.

**ARGUED**: Daniel Lewis Cox, MARR & COX, LLP, Baltimore, Maryland, for Appellant. Joseph Garrett Wozniak, KOLLMAN & SAUCIER, P.A., Timonium, Maryland, for Appellee. **ON BRIEF**: Eric Paltell, KOLLMAN & SAUCIER, P.A., Timonium, Maryland, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

DUNCAN, Circuit Judge:

Vincent Mercer ("Mercer" or "Plaintiff") appeals the district court's order granting summary judgment to his former employer, PHH Corporation ("PHH"), on Mercer's race discrimination and retaliation claims under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"). PHH terminated Mercer after an internal investigation revealed that Mercer was involved in manipulating the performance statistics of the call center he managed. Mercer filed this lawsuit, alleging that PHH's proffered reasons for his termination were a pretext for race discrimination and retaliation. For the reasons that follow, we conclude that Mercer failed to exhaust his claim of race discrimination. With respect to Mercer's claim of retaliation, we conclude that Mercer failed to adduce evidence rebutting the legitimate business reason PHH articulated for terminating his employment. We therefore affirm the judgment of the district court.

I.

A.

PHH is a company that "provides outsourced vehicle fleet management solutions to corporate clients." J.A. 40.[1] Vincent

---

[1] "J.A." refers to the Joint Appendix filed by the parties in this appeal.

Mercer, an African-American male, began working as a call center representative for PHH in 1999. In 2007, Mercer joined PHH's Diversity Committee; a year later, the Committee elected Mercer as their Chairman.

In March 2010, the Chief Executive Officer of PHH, Jerry Selitto, held a town hall meeting with his employees. At the meeting, Selitto made remarks that Mercer and other employees found to be racially insensitive.[2] Employees reported their concerns to Mercer in his capacity as Chairman of the Diversity Committee. Mercer in turn relayed these concerns to Rita Ennis, the Senior Vice President of Human Resources, who arranged a time for Mercer and the Committee to meet with Sellito to discuss the incident. During a conversation about scheduling this meeting, Ennis allegedly told Mercer "if it's a fight you want, it's a fight you'll get."[3] J.A. 171.

_____

[2] Mercer and PHH dispute exactly what Selitto said at the meeting. According to Mercer, Selitto told employees that Selitto was not "the captain of a slave ship sent to whip his people into shape" and, in a second analogy, he referenced an experiment where monkeys in a cage attempted to reach a banana. J.A. 153-54. Because Mercer does not base his claims on Sellito's alleged remarks, we have no occasion to opine on what Sellito said at the meeting. These comments are only significant to the issues before us insofar as they prompted Mercer to engage in protected activity.

[3] Mercer does not recall the exact date Ennis made this statement, nor does he recall the precise context of the statement in their conversation. Ennis denies making the statement.

After Selitto met with the Diversity Committee, Mercer approached Selitto individually, and the two agreed that Selitto would apologize for his comments. Mercer worked with Ennis, Selitto, and another employee to draft an apology email addressed to all PHH employees. On May 13, 2010, Selitto sent the apology email.

B.

At the time of the incident, Mercer's job within the company was to supervise a call center for one of PHH's clients, Budget Truck Rental ("BTR"). Mercer held this position along with Louis Nehmsmann, a white male, who served as the center's second supervisor. Mercer and Nehmsmann had identical supervisory duties, and they were jointly responsible for a team of forty agents in a call center dedicated solely to BTR.

The BTR call center handled calls from BTR drivers, vendors, and employees. Upon receiving a call, the center's automated system would first prompt the caller to identify himself or herself as a driver, vendor, or employee. The system would then transfer the caller to the relevant telephone extension. Once routed, the call would go into a queue, and the caller would wait for the next available agent. Agents who answered calls were expected to stay on the line until they resolved the caller's problem, but they were permitted to seek

4

guidance if the caller was unhappy or if the agent did not know how to address the caller's problem.

BTR tracked PHH's performance by measuring, among other metrics, the "Average Speed of Answer" ("ASA"), the average time that calls would wait in the queue before an agent answered. PHH's contract with BTR set a target ASA of two minutes. In addition to monitoring the ASA, PHH also tracked the average amount of time agents spent on each call. PHH reported its call statistics to BTR on a monthly basis.

In late May 2010, PHH developed a "triage" system for high-call-volume periods. The idea was to reduce caller wait times by diverting complex calls to a Special Client Service ("SCS") team. Under this system, if the agent could not promptly address the caller's problem, the agent would tell the caller that he or she would receive a call back from a specialized agent within thirty minutes. The agent would then forward the caller's information and a summary of the problem to the SCS team. By managing calls in this manner, the call center freed up agents to address simple calls, thereby reducing wait times in the call queue.

In June 2010, Nehmsmann devised a plan, known as "call-flipping," to reduce the ASA during high volume periods by taking advantage of the way BTR calculated the ASA. Unlike the triage system, which screened out complex calls to promote

efficiency, Nehmsmann's system cheated PHH's performance metrics by "flipping" calls from one queue to another. As Nehmsmann explained in his deposition, "[t]he idea was to take the call, talk to the driver, tell them you would get somebody to help them, and then put them on hold." J.A. 217. When the agents first answered the call, it would be removed from the queue of incoming calls, transferred to extension 16310, and marked "answered" for purposes of calculating PHH's ASA. But by immediately transferring the call, the agent would not actually reduce the wait time for individual callers. Instead, those callers would remain on hold in a second internal queue even though PHH's performance metrics would reflect that the call had been answered. Essentially, the agents would manipulate the call-tracking system by answering calls and immediately placing them back on hold.

Though Mercer "wasn't necessarily a fan" of the call-flipping idea when Nehmsmann first discussed it, Mercer felt it was in PHH's best interest to try the plan. J.A. 111. On June 18, 2010, Nehmsmann emailed his Team Leads with instructions for the agents in the BTR call center. The relevant portion of the email is reproduced below:

[A]ll we want them to do is answer the phone

"Thanks for calling Budget truck rental-- Zelda Speaking how can I help you" ==

6

> I need RSA --
>
> "OK please hold I'll get a dispatcher for you"
>
> And bail to x16310
>
> That's all they will do all day long[.]

J.A. 260. Nehmsmann copied Mercer on the email, but did not copy their supervisor, Tim Mackin. In subsequent emails to the team, Nehmsmann repeatedly encouraged agents to flip calls. Mercer was also copied on these emails.

### C.

PHH monitors and analyzes incoming calls for quality control purposes. In July 2010, a Quality Analyst named Daniel Hahn conducted a routine review of PHH's "Agent Release Report," which shows all calls that last 30 seconds or less. In reviewing the data for June 2010, Hahn "noticed a few agents who repeatedly showed up on the report." J.A. 265. When he listened to their calls, he learned that the agents were simply answering the calls, briefly listening to the caller's problem, and telling the caller "we can take care of that; I will transfer you to my dispatcher." J.A. 266. However, the calls were never transferred to a dispatcher, because PHH did not have any "dispatchers." Instead, the calls were placed on hold, where the caller would wait in the queue for up to 50 minutes.

Troubled by his findings, Hahn spoke with Mercer, who told him "I got it." J.A. 266. Concerned that Mercer did not

7

understand the significance of the problem, Hahn contacted Mercer's supervisor, Chuck Hogarth.[4] Hogarth immediately examined the call center's data and discovered that, in the period between June and July 25, 2010:

- BTR agents transferred 5,045 calls to extension 16310;

- The true ASA for the calls transferred to extension 16310 was 5:51, nearly three times the target ASA of two minutes;

- 28.3% of all callers transferred to extension 16310 abandoned the call, nearly triple the call center's normal rate; and

- The maximum wait time for a call transferred to extension 16310 exceeded 54 minutes.

J.A. 256. Hogarth also discovered several emails from Nehmsmann instructing the agents to flip the calls.

When Hogarth approached Mercer and Nehmsmann about the call data, they admitted to flipping calls and claimed that Mackin had approved the scheme. On July 28, 2010, Hogarth spoke with Mackin, who denied approving the program and stated that he was not aware that agents were flipping calls. That same day, Hogarth contacted Kim Bolin, the Contact Center Director, who was on vacation at the time. Hogarth told Bolin about the call-

---

[4] Hogarth had recently replaced Tim Mackin as Mercer and Nehmsann's supervisor. Mackin had served as a temporary supervisor from June to July 2010 while PHH recruited to fill the position.

flipping problem, and she informed him that she had not approved the scheme and that the agents must immediately stop flipping calls.

Bolin and Ellen Quinn-Hamlin, the Senior Manager in Human Resources, decided to conduct an internal investigation into the use of extension 16310 to flip calls. As part of the investigation, they interviewed Mercer, Nehmsmann, Mackin, Wilrosea Moncour, Chris Koutek,[5] and Michele Roberts.[6] When Bolin and Quinn-Hamlin interviewed Mercer, he said that he had discussed the plan with Mackin--his supervisor at the time--during a morning meeting. He further stated that the process was implemented "[to not] make ourselves look like idiots." J.A. 593. Nehmsmann, in turn, admitted to engineering the scheme. Mackin, however, said that he was entirely unaware that agents were flipping calls. He said that he had attended meetings about the triage process, but had never been involved in any discussions about call-flipping.

Bolin and Quinn-Hamlin reviewed the BTR center's emails, and discovered that although Mercer and Nehmsmann sent and

---

[5] Moncour and Koutek were "team leads" in the call center. They reported to Mercer and Nehmsmann, and were responsible for overseeing agents.

[6] Roberts was a supervisor who did not work in the BTR call center, but who attended team meetings with Mercer and Nehmsmann.

9

received emails discussing call-flipping, they never copied Mackin, Hogarth, or any other supervisor to whom they reported. Bolin also had the call data re-examined. A review of call statistics revealed that the call-flipping process had artificially reduced the ASA by 30% in June 2010 and 34% in July 2010. PHH reported the corrected call data to BTR after discovering that the statistics had been manipulated.

On August 24, 2010, Ennis, Quinn-Hamlin, Pam Walinksi (Vice President of Customer Services), and Tom Keilty (Senior Vice President of Customer and Vehicle Services and Chief Operating Officer), met to discuss the findings of the internal investigation. They decided to terminate both Mercer and Nehmsmann for engaging in the call-flipping scheme, and on August 26, 2010, PHH issued Mercer and Nehmsmann termination letters that cited their "total disregard for and breach of PHH's Code of Ethics in accurately disclosing and representing factual business information." J.A. 572, 574. Of the individuals involved in deciding to terminate Mercer, only Ennis was involved in Mercer's activity in response to Selitto's remarks at the town hall meeting. And it is undisputed that she did not initiate the review of call data that prompted the investigation of the scheme.

D.

Following his termination, Mercer filed a Charge of Discrimination with the Equal Employment Opportunity Commission and the Maryland Commission on Human Relations. The form for the complaint contained a section with the heading "Discrimination Based On." Underneath that heading were check-boxes for eleven different types of discrimination: race, color, sex, religion, national origin, retaliation, age, disability, genetic information, and "other." Mercer's complaint contained a checkmark in the "retaliation" box alone. The narrative portion of the charge stated:

> I. I began my employment with above-named employer in November 2000. My position was Supervisor. I did not have disciplinary or performance issues; in fact, I was an exemplary employee. Furthermore, I was the chair of the Diversity Committee. In or about the last week of April 2010, I had a discussion with the CEO Jerry Selitto; regarding comments made by him. These comments which referenced "Slaves, Whips and Monkeys" were perceived by the employee population to be racially motivated and discriminatory. I provided recommendation regarding this issue. On August 26, 2010, I was discharged by Ellen Quinn-Hamlin, Senior Manager of Human Resources, and Kim Bolin, Director of Customer and Vehicle Service.
>
> II. The reason given for discharge was for total disregard and breach of my employers' code of ethics.
>
> III. I believe I was discriminated against and subject to retaliation for engaging in a protected activity in violation of Title VII of the Civil Rights Act of 1964, as amended, with respect to discharged.

11

J.A. 295.  The charge did not contain any other information regarding the substance of Mercer's allegations.  After receiving a right to sue notice, Mercer timely filed his complaint in the district court.

PHH filed a motion for summary judgment, seeking dismissal of Mercer's complaint.  With respect to Mercer's claim of race discrimination, the district court found that Mercer failed to exhaust his administrative remedies.  Regarding Mercer's retaliation claim, the district court held that Mercer failed to show "any evidence upon which a reasonable jury could conclude that those who terminated him knew about his complaints about Selitto."  J.A. 565-66.  Further, the district court found that Mercer failed to present sufficient evidence that PHH's legitimate, non-retaliatory reason for discharging Mercer was pretextual.  The district court entered judgment for PHH, and Mercer timely appealed.

II.

On appeal, Mercer argues that the district court erroneously granted summary judgment to PHH on his claims of race discrimination and retaliation.  We address each of Mercer's claims in turn.

A.

The district court concluded that Mercer failed to include his claim of race discrimination in his administrative charge of discrimination. A plaintiff's failure to exhaust his administrative remedies deprives the federal courts of subject matter jurisdiction over his Title VII claim. Jones v. Calvert Grp., Ltd., 551 F.3d 297, 300 (4th Cir. 2009). We review a dismissal for lack of subject matter jurisdiction de novo. Balas v. Huntington Ingalls Indus., Inc., 711 F.3d 401, 406 (4th Cir. 2013).

Because a plaintiff may only pursue claims that have been administratively exhausted, "[t]he scope of the plaintiff's right to file a federal lawsuit is determined by the charge's contents." Jones, 551 F.3d at 300. Accordingly, "a plaintiff fails to exhaust his administrative remedies where . . . his administrative charges reference different time frames, actors, and discriminatory conduct than the central factual allegations in his formal suit." Snydor v. Fairfax Cty., 681 F.3d 591, 594 (4th Cir. 2012) (quoting Chacko v. Patuxent Inst., 429 F.3d 505, 506 (4th Cir. 2005)). Upon reviewing Mercer's charge of discrimination, we conclude that Mercer failed to exhaust his claim of race discrimination because that claim does not appear anywhere on the form Mercer submitted to the Maryland Commission

13

on Human Relations and the Equal Employment Opportunity Commission.

First, the check-box section of the form lists only "retaliation" as the basis for the charge. Mercer asserts that the Maryland Commission on Human Relations was responsible for filling out the form based on his oral complaint, and he should not be penalized for the Commission's failure to check the "race" box. According to Mercer, he related his allegations to an investigator, who was responsible for selecting the boxes on the form. Although an agency's involvement in drafting a complaint does not excuse any deficiency in the charge, see Balas, 711 F.3d at 408-09, we agree with Mercer that his failure to check a box on the form is not dispositive. Instead, we look at the charge as a whole, and the absence of a checked box is only one factor in our analysis.

Second, and more importantly, the narrative section of the charge only sets out an allegation of retaliation. The charge briefly describes the town hall incident, and concludes: "I believe I was discriminated against and subject to retaliation for engaging in protected activity." J.A. 295. The charge does not allege, at any point, that PHH terminated Mercer because of

14

his race.[7]  Given that Mercer failed to present his claim of race discrimination in his administrative charge, we conclude that he forfeited that claim.

Mercer points to PHH's response to the administrative charge, arguing that PHH construed his charge to contain a race discrimination claim.  Contrary to plaintiff's position, it makes no difference that PHH responded to Mercer's charge of discrimination with a letter that referenced a possible claim of race discrimination.  See J.A. 420 ("For the reasons set forth herein, there is simply no evidence to substantiate Mercer's claim of race discrimination and possible unlawful retaliation.").  It was Mercer's obligation to exhaust his claims, and the fact that PHH used the phrase "race discrimination" in its response to the charge did not remove that burden.[8]  If we were to accept Mercer's argument, then employers would be wary indeed of responding fully to a charge of discrimination, lest they inadvertently expand the scope of the claims properly presented before the investigating agency.

---

[7] At most, the charge states that Selitto's comments at the town hall meeting were "racially discriminatory," J.A. 295, but Sellito's comments have nothing to do with Mercer's claim that Ennis terminated him because of his race.

[8] In any event, it is impossible for us to tell what claims the letter refers to, because Mercer has only included the first page of PHH's letter in the Joint Appendix.

Accordingly, we affirm the dismissal of Mercer's race discrimination claim for lack of subject matter jurisdiction.

B.

We next address Mercer's claim of retaliation. Mercer claims that PHH--and specifically, Rita Ennis--retaliated against him for complaining about Sellito's remarks during the town hall meeting. For the reasons set forth below, we agree with the district court that Mercer failed to present a genuine dispute of material fact that PHH retaliated against him.

We review de novo a district court's order granting summary judgment. Jacobs v. N.C. Admin. Office of the Courts, 780 F.3d 562, 565 n.1 (4th Cir. 2015). "A district court 'shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'" Id. at 568 (quoting Fed. R. Civ. P. 56(a)). In determining whether a genuine issue of material fact exists, we review "all facts and reasonable inferences therefrom in the light most favorable to the nonmoving party." T-Mobile Ne. LLC v. City Council of Newport News, 674 F.3d 380, 385 (4th Cir. 2012) (citation omitted). However, "[c]onclusory or speculative allegations do not suffice, nor does a mere scintilla of evidence in support of [the nonmoving party's] case." Thompson v. Potomac Elec. Power Co., 312 F.3d 645, 649 (4th Cir. 2002) (internal quotation marks and citation omitted).

16

When a plaintiff lacks direct evidence of retaliation, we apply the familiar burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). Foster v. Univ. of Md.-E. Shore, 787 F.3d 243, 250 (4th Cir. 2015). First, the plaintiff must establish a prima facie case by demonstrating that (1) he engaged in a protected activity, (2) his employer took an adverse action, and (3) there was a causal connection between the two. Id. (citing Price v. Thompson, 380 F.3d 209, 212 (4th Cir. 2004)). Once the plaintiff establishes a prima face case, the burden shifts to the employer to proffer a legitimate, non-retaliatory reason for taking an adverse action against the employee. Id. (citing Hill v. Lockheed Martin Logistics Mgmt., Inc., 354 F.3d 277, 285 (4th Cir. 2004)). If the employer satisfies this burden, the plaintiff must show that the employer's reason was a pretext for retaliation. Id. (citing Hill, 354 F.3d at 285).

Even if we assume, at step one of our analysis, that Mercer established a prima facie case of retaliation, PHH has clearly demonstrated a non-retaliatory reason for terminating Mercer: his misconduct. It is undisputed that Mercer participated in a call-flipping scheme with the intention of misrepresenting performance statistics to PHH's client, in breach of the company's ethics policy. The company's investigation into the scheme and its decision to terminate Mercer for misconduct are

17

well documented, and Mercer has admitted to participating in the call-flipping scheme.[9] Thus, at step two of the McDonnell Douglas framework, we conclude that PHH has demonstrated a legitimate, non-retaliatory reason for firing Mercer. We therefore proceed to step three of the McDonnell Douglas analysis.

Mercer contends that, under step three, he has demonstrated sufficient evidence of pretext to prevail on his retaliation claim. At this stage of the burden-shifting framework, a plaintiff must adduce evidence from which a jury could reasonably conclude that "the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination." Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248, 253 (1981). To carry this burden, a plaintiff must offer direct or circumstantial evidence that calls into question the employer's explanation. See Walker v. Mod-U-Kraf Homes, LLC, 775 F.3d 202, 211 (4th Cir. 2014) (finding no reasonable inference of pretext in the absence of either direct

---

[9] Mercer asserts that PHH has given inconsistent reasons for terminating him. We disagree. During Mercer's unemployment proceedings, PHH stated that the company terminated Mercer for failing to perform his job, and this statement is entirely consistent with Mercer's termination for misconduct. Mercer's job was to supervise agents responsible for answering calls in the BTR call center. He failed to do his job when he directed agents to flip calls instead of answering them.

18

or circumstantial evidence). In evaluating a plaintiff's allegation of pretext, we are mindful that "it is not our province to decide whether the reason was wise, fair, or even correct, ultimately, so long as it truly was the reason for the plaintiff's termination." Hawkins v. PepsiCo, Inc., 203 F.3d 274, 279 (4th Cir. 2000) (quoting DeJarnette v. Corning, Inc., 133 F.3d 293, 299 (4th Cir. 1998)).

We conclude that the record is bereft of any evidence from which a jury could find that PHH's proffered reasons are pretextual, because Mercer has failed to call into question PHH's non-retaliatory reason for firing him. Indeed, it would have been exceptionally difficult for Mercer to overcome the strong evidence that the call-flipping scheme prompted his termination rather than his earlier protected activity. As we discuss below, there was no connection between Mercer's complaints of racial discrimination and the discovery of his misconduct. Moreover, Mercer was treated identically to Nehmsmann, who did not engage in any protected activity.

Significantly, the scheme was only uncovered when a quality analyst--who had nothing to do with the town hall incident--discovered the misrepresented data during a routine review of calls. Even in response to questioning at oral argument, Mercer failed to identify anyone involved in the town hall incident who initiated the review of the BTR call center's

19

data. Among the individuals who participated in the ultimate decision to terminate Mercer, only Ennis was involved in the town hall incident, and Mercer has failed to connect Ennis to Hahn's discovery of the scheme. This fact is not dispositive, as Mercer might have adduced evidence that, although Ennis did not initiate the review or discover the misrepresentation herself, she nevertheless acted retaliatorily in response to this information. But again, Mercer failed to produce any evidence to that effect.

Mercer points to Ennis's alleged statement that "if it's a fight you want, it's a fight you'll get" as evidence of her retaliatory motive. This lone remark is insufficient evidence of pretext, however, because Mercer has not provided any context for it, and it is unclear what it was intended to express. Moreover, the comment occurred substantially prior to the investigation that prompted Mercer's termination, which undermines the causal connection Mercer attempts to draw between the comment and his termination. See Merritt v. Old Dominion Freight Line, Inc., 601 F.3d 289, 300 (4th Cir. 2010) ("[I]n the absence of a clear nexus with the employment decision in question, the materiality of stray or isolated remarks is substantially reduced.").

Further, as we have noted, PHH terminated both Mercer and Nehmsmann for violating the same policy, and there is no

20

evidence that Nehmsmann engaged in any protected activity under Title VII. See Laing v. Fed. Express Corp., 703 F.3d 713, 722-23 (4th Cir. 2013) (finding no pretext when company investigated and then terminated both an employee who engaged in protected activity and an employee who did not for violating the same company policy). We do not hold that any time an employer simultaneously terminates an employee who did not engage in the protected activity along with the one who did the employer is free from liability, as such a holding might lead to perverse results. Nevertheless, here, there is no evidence that Nehmsmann was fired for any other reason than that he was "violating the exact same company policy in the exact same way." See id. at 723.

Faced with the evidentiary deficiencies just discussed, Mercer points to alleged flaws in the internal investigation to support his claim that PHH's actions were suspicious. For example, he claims that Bolin and Quinn-Hamlin failed to interview several agents in the call center who would have testified that PHH authorized the call-flipping scheme. He further asserts that Bolin and Quinn-Hamlin gave Mackin favorable treatment by telling him the purpose of the investigation before questioning him. However, the fact that the investigation may not have been as thorough as Mercer would have liked falls far short of establishing pretext. See Bonds

v. Leavitt, 629 F.3d 369, 386 (4th Cir. 2011) (finding that evidence of an "improper or substandard" investigation does not demonstrate pretext) (citing Hux v. City of Newport News, 451 F.3d 311, 315 (4th Cir. 2006)).

Mercer next contends that the call-flipping scheme cannot have been the real reason for his termination, because PHH approved of the plan to manipulate call data. The record, however, simply does not support this assertion. Significantly, after Mercer and Nehmsmann admitted to PHH that they engineered the call-flipping scheme, the company discovered that their emails discussing the scheme were never copied to Mackin--or any other supervisor, for that matter. Mercer did testify that Mackin approved the call-flipping plan during a meeting. But even though we are required to accept as true Mercer's testimony about Mackin's role in the scheme, PHH was not required to accept Mercer's claim that he had received managerial approval for the scheme. Moreover, there is no evidence that the managers who investigated the scheme and terminated Mercer--namely, Bolin, Quinn-Hamlin, Walinsky, and Keilty--had previously authorized or even known about the scheme. And, on this point, it bears emphasizing that the managers who terminated Mercer outranked Mackin.

22

Based on the record, we find that the only conclusion a jury could reasonably draw from the evidence of record is that PHH terminated Mercer for misconduct.

## III.

For the foregoing reasons, the judgment of the district court is

AFFIRMED.