**UNPUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

**No. 19-1871**

MICHAEL TINSLEY,

        Plaintiff - Appellee,

    v.

CITY OF CHARLOTTE,

        Defendant - Appellant.

Appeal from the United States District Court for the Western District of North Carolina, at Charlotte.  Graham C. Mullen, Senior District Judge.  (3:16−cv−00656−GCM)

Argued:  October 28, 2020                    Decided:  May 5, 2021

Before GREGORY, Chief Judge, and WILKINSON and KEENAN, Circuit Judges.

Vacated and remanded by unpublished opinion.  Judge Keenan wrote the majority opinion, in which Judge Wilkinson joined.  Chief Judge Gregory wrote a dissenting opinion.

Lori R. Keeton, LAW OFFICES OF LORI KEETON, Charlotte, North Carolina, for Appellant.  Geraldine Sumter, FERGUSON CHAMBER & SUMTER, P.A., Charlotte, North Carolina, for Appellee.

Unpublished opinions are not binding precedent in this circuit.

BARBARA MILANO KEENAN, Circuit Judge:

This appeal involves the firing of a Charlotte-Mecklenburg Police Officer, Michael Tinsley. Although City police officers were not prohibited from engaging in romantic relationships with other police officers, Tinsley alleged that he was subject to sex discrimination because he was fired while the female officer with whom he had a sexual relationship was not also fired for related misconduct. The female officer had accused Tinsley of rape but, after an internal investigation, the charge was not sustained.

The defendant, the City of Charlotte (the City), argued at trial that the City fired Tinsley for misconduct unrelated to the rape allegation, and that Tinsley's evidence was insufficient as a matter of law to establish Tinsley's former romantic partner as a valid "comparator." In unsuccessfully arguing that Tinsley had failed to present evidence of a valid "comparator," the City relied, among other things, on Tinsley's different and more extensive record of misconduct.

The district court submitted the case to the jury, which returned a verdict for Tinsley in the amount of $125,000 on the sex discrimination claim and for the City on the race discrimination claim. The court later held a hearing to determine equitable remedies and awarded Tinsley back pay, front pay, an income tax offset, and attorneys' fees. Following that decision, the City filed a renewed motion for judgment as a matter of law or, alternatively, for a new trial. The court denied these motions, and the City now appeals that decision, as well as the court's award of back pay, front pay, tax offset, and attorneys' fees.

Upon our review, we agree with the City that Tinsley failed as a matter of law to identify a valid comparator on his sex discrimination claim because his sole comparator (1) did not engage in similar misconduct for which only Tinsley was fired, (2) did not have a comparable disciplinary history, either before or after the rape investigation, and (3) was sanctioned, as was Tinsley, under a progressive discipline system reflecting their very different records of misconduct. We therefore conclude that the evidence was insufficient as a matter of law to show that Tinsley was fired because of his sex. Based on this conclusion, we agree with the City that we also must vacate the district court's award of equitable damages and attorneys' fees and costs. Accordingly, we vacate the district court's judgment in favor of Tinsley and remand for entry of judgment in favor of the City.

I.

Tinsley was a police officer for the Charlotte-Mecklenburg Police Department (the Department). He was hired in March 1998, was recommended for termination of employment in August 2013, and was fired in July 2014. Tinsley spent his entire tenure with the Department as a patrol officer. Before his employment was terminated, Tinsley had a lengthy disciplinary history, including at least 25 violations that are discussed in more detail below. Despite these violations, Tinsley generally received positive performance reviews.

Aimee Aquino was hired by the Department in 2009 and has worked as a patrol officer during her entire tenure with the Department. Until May 2013, when Aquino accused Tinsley of rape, her disciplinary history included only three infractions. After May

2013, Aquino was cited and sanctioned for seven more incidents of misconduct prior to Tinsley's citation for termination.

In 2011, Tinsley and Aquino began a sexual relationship that lasted about two years. After Tinsley rejected Aquino's preference for a more serious relationship, Tinsley accused Aquino of harassing behavior, which included her responding to his service calls and visiting his division office unannounced. Tinsley complained about Aquino's actions and, on May 7, 2013, Aquino's supervisor ordered her to stay out of Tinsley's division. Later that day, Aquino reported to a colleague that Tinsley had raped her on April 2, 2013. Despite Aquino's reluctance, the colleague immediately reported the alleged rape to the Department's Internal Affairs Division (Internal Affairs).[1]

Sergeant M.G. Burke, who was assigned to Internal Affairs, conducted the Department's internal investigation of the rape allegation. As part of the investigation, Sergeant Burke interviewed both Tinsley and Aquino and obtained their cell phone records. Aquino told Burke that Tinsley had raped her on April 2, 2013, between 2:00 and 3:00 a.m. Aquino's phone records, however, showed that on the night in question she spoke with another person for 26 minutes, starting at 1:55 A.M. Burke also recorded in his notes of the investigation that Tinsley admitted to having consensual sex with Aquino on the night of the alleged rape. After concluding his interviews of Tinsley and Aquino, Burke initiated

---

[1] Upon receiving a complaint, Internal Affairs conducts a review and produces a memorandum summarizing the allegations, rules of conduct at issue, and the investigator's factual findings. Thereafter, the Chain of Command Review Board reviews the case and adjudicates the matter. No member of the Chain of Command Review Board is in an officer's actual chain of command.

two charges against Tinsley for his alleged failure to conform with the law and for unbecoming conduct, based on Tinsley's alleged commission of sexual assault. However, Burke did not make any recommendation about the discipline Tinsley might receive.

The Chain of Command Review Board (CCRB) reviewed the two charges initiated by Burke. Following a hearing, the CCRB declined to sustain either charge. While four of the five members of the CCRB voted to sustain the charges, Major Johnny Jennings, who had the final decision-making authority, declined to sustain the charges against Tinsley on the grounds of insufficient evidence. Accordingly, Tinsley was *not* punished by the Department for the alleged rape.

At the CCRB hearing, Tinsley received two additional charges for his failure to respond adequately during the rape investigation. Captain Roslyn Maglione testified at trial that Tinsley told "three different stories" about the alleged rape and provided different details at the CCRB hearing than he did during the Internal Affairs investigation. Major Jennings informed Police Chief Rodney Monroe that Tinsley had not offered complete details to Burke during his interviews and had revealed information at his CCRB hearing that should have been disclosed earlier in the investigation.

Tinsley disputes the Department's characterization that he lacked candor when he told inconsistent stories during the rape investigation. At trial, he testified that he was merely responding to different questions being asked in each interview, and that he had not contradicted himself. The CCRB sustained the two additional charges for Tinsley's lack of candor, and he received a 240-hour suspension without pay for this misconduct.

In addition, Tinsley later received four additional rule of conduct charges unrelated to the rape allegation. Based on an examination of his cell phone records,[2] the Department learned that Tinsley improperly had conducted a stolen firearm inquiry and a DMV inquiry and had requested that another officer dismiss a traffic violation for a friend. During the investigation of these charges, Tinsley provided inconsistent statements about whether he had completed and printed the results of the DMV query. As a result of his conduct, Tinsley was charged with (1) improper use of department equipment, (2) violation of the rules, (3) intervention in another officer's investigation, and (4) inadequate participation in an administrative investigation (the cell phone record charges). All these charges were sustained against Tinsley in August 2013.

At trial, Tinsley disputed the bases for these charges. He testified that he had used the police equipment in response to lawful requests, and that he had not interfered with another officer's investigation. He also stated that he did not lack candor in the misuse of equipment investigation, because he told the investigator that he did not recall printing the driving record, instead of outright denying that he had printed the record.

---

[2] As discussed further below, Aquino also received three charges following the search of her cell phone records. Aquino had improperly conducted a department of motor vehicles (DMV) inquiry and had contacted another Department officer requesting that a citation be dismissed. She was charged with misuse of department equipment, violation of the rules, and impermissible intervention. As discipline, Aquino received a 40-hour suspension without pay.

Tinsley also received other unrelated charges in the summer of 2013, including abuse of position and lack of courtesy. These charges arose after he parked in an unauthorized parking space at a local church that he visited to engage in personal physical exercise. As Tinsley was about to receive a parking ticket, he allegedly told the parking attendant that he was a police officer and that the attendant lacked jurisdiction to issue a ticket.

The parking attendant, John Harper, testified that during the incident he told Tinsley he was going to issue a warning violation, and that Tinsley responded by telling Harper multiple times that he was a police officer, getting within six inches of Harper's face and intimidating him. A supervisor for Harper testified that an internal investigation revealed that Harper had acted properly because Tinsley was not parked in a lawful parking spot.

At trial, Tinsley disputed this version of events regarding the parking lot incident. He testified that he had permission to park in the space in question as long as he did not block traffic, and that he had parked there repeatedly for three years without incident. Tinsley testified that on the day in question, he merely asked why Harper was towing his car and requested to speak to a supervisor. Tinsley denied threatening Harper or invoking his status as a police officer. Tinsley's friend, who witnessed the parking lot incident, testified that Tinsley was polite, and that Harper had been "irate" and "abrasive" with Tinsley. Despite Tinsley's protestations, he received charges related to this incident, namely, abuse of position and lack of courtesy.

Tinsley's CCRB hearing on the charges arising from the church parking lot incident was combined with the hearing on the cell phone record charges. The hearing occurred on

7

August 23, 2013. After consideration of Tinsley's numerous citations and entire disciplinary history, the CCRB recommended that Tinsley be fired, and Chief Monroe agreed with the recommendation. Major Lafreda Lester testified at trial that when the CCRB considered Tinsley's entire record, along with the Department's progressive discipline policy and Tinsley's recent 240-hour suspension for lack of candor during the rape investigation, the CCRB concluded "that there was no other recourse but to cite [Tinsley] for termination." In July 2014, the Civil Service Board voted 3-2 to terminate Tinsley's employment.

Prior to his Civil Service Board hearing, Tinsley filed a lawsuit against Aquino, in her individual capacity, in North Carolina state court alleging that Aquino had slandered him based on her accusation of rape. After a trial, the jury returned a verdict for Tinsley and fixed damages at $50,000. The City, which had provided and paid for Aquino's legal defense, later settled the suit for $41,500 in July 2016.

After obtaining this settlement, Tinsley sued the City for sex and race discrimination in violation of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq*. During trial, Tinsley presented Aquino as his sole "comparator" on the sex discrimination charge, asserting that she was a similarly situated female officer who was not disciplined by the Department even though she had engaged in similar misconduct. The City objected and moved for judgment as a matter of law at the close of Tinsley's case-in-chief and at the close of the evidence, arguing that Aquino was not a valid comparator. The district court denied both motions. The jury returned a verdict in favor of Tinsley on the sex

8

discrimination claim but rejected his race discrimination claim. The jury awarded him $125,000 in compensatory damages.

Tinsley also sought equitable remedies, including back pay and front pay, which were not subject to a jury determination. Following a hearing, the district court ordered that Tinsley receive from the Department back pay in the amount of $699,820, front pay in the amount of $629,210, and a federal income tax offset of $342,345. In total, the court entered judgment for Tinsley in the amount of $1,671,376. The City filed a renewed motion for judgment as a matter of law, or alternatively for a new trial, which the court denied. The court also awarded Tinsley $330,797.50 in attorneys' fees and $22,045.57 in costs. The City now appeals.

II.

We review de novo the denial of a directed verdict and motion for judgment as a matter of law, construing all evidence in favor of the non-moving party. *Horne v. WTVR, LLC*, 893 F.3d 201, 210 (4th Cir. 2018); *Dotson v. Pfizer, Inc.*, 558 F.3d 284, 292 (4th Cir. 2009). We will not disturb a jury verdict when "there was sufficient evidence for a reasonable jury to find in the non-movant's favor." *Dotson*, 558 F.3d at 292.

At the outset, we recognize that overturning a jury verdict is a serious matter and one that we do not take lightly. But "[w]hile we are compelled to accord the utmost respect to jury verdicts and tread gingerly in reviewing them, we must grant judgment as a matter of law when there is no legally sufficient evidentiary basis for the verdict." *Lack v. Wal-Mart Stores, Inc.*, 240 F.3d 255, 259 (4th Cir. 2001) (citation and internal quotation marks

9

omitted); *see also Noble v. Brinker*, *Int'l, Inc.*, 391 F.3d 715, 732 (6th Cir. 2004) (noting that courts are hesitant to overturn jury verdicts but reversing the judgment because the evidence was insufficient for the jury to conclude racial discrimination was the reason for the plaintiff's discharge).  As discussed below, we are required to overturn the jury verdict in this case because Aquino was not a valid comparator and, thus, there was insufficient evidence as a matter of law for a jury to find that Tinsley's employment was terminated because of his sex.

Although both parties frame their arguments in terms of the burden-shifting framework under *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), "that approach is inapposite when a trial has proceeded to completion."  *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002).  When a jury verdict has been rendered and the appeal is based on the denial of a motion for judgment as a matter of law, the only question is whether there is support for the trier of fact's determination that "the plaintiff was the victim of intentional discrimination."  *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000).

Ordinarily, to establish a prima facie case of sex discrimination regarding disparate disciplinary treatment, the plaintiff must show that: (1) he is a member of a class protected by Title VII; (2) the misconduct in which he engaged was comparable in seriousness to the misconduct of employees outside the protected class; and (3) the disciplinary measures enforced against him were more severe than those enforced against those other employees outside his protected class.  *Hoyle v. Freightliner, LLC*, 650 F.3d 321, 336 (4th Cir. 2011) (citing *Taylor v. Va. Union Univ.*, 193 F.3d 219, 234 (4th Cir. 1999) (en banc), *abrogated*

10

*on other grounds by Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)); *Moore v. City of Charlotte*, 754 F.2d 1100, 1105-06 (4th Cir. 1985).  To demonstrate causation, a plaintiff may present a similarly situated comparator who is not a member of the plaintiff's protected class.  *Laing v. Fed. Express Corp.*, 703 F.3d 713, 719-20 (4th Cir. 2013).

In such a circumstance, a male plaintiff alleging sex discrimination under Title VII, as a matter of law, must show that he and his female comparator are similarly situated in all material respects.  *Spencer v. Va. State Univ.*, 919 F.3d 199, 207-08 (4th Cir. 2019) (citing *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)); *Lewis v. City of Union City*, 918 F.3d 1213, 1218 (11th Cir. 2019) (explaining that comparators must be similarly situated in all material respects to allow for a meaningful comparison).  The requirement that a plaintiff and his comparator be similarly situated promotes the goals of Title VII by helping to identify discrimination.  "[T]he very term 'discrimination' invokes the notion of treating two persons differently on the basis of a certain characteristic that only one possesses."  *Laing*, 703 F.3d at 719.  Comparator evidence is "particularly probative" in determining whether an adverse employment action was the result of discrimination, because such evidence allows the fact finder to make an objective inquiry and to control for other explanations for termination.  *Id*. at 719-20.

A plaintiff can demonstrate that he is similarly situated with a comparator by showing that they both (1) "dealt with the same supervisor," and (2) were "subject to the same standards and . . . engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it."  *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223-24 (4th Cir. 2019).

11

However, a comparator's conduct need not be identical to the plaintiff's, or involve "precisely the same set of work-related offenses occurring over the same period of time and under the same sets of circumstances." *Id*. at 223. Nevertheless, the misconduct of the proposed comparator must be similar enough to that committed by the plaintiff to ensure that courts do not "confus[e] apples with oranges. . . . In other words, apples should be compared to apples." *Silvera v. Orange Cnty. Sch. Bd*., 244 F.3d 1253, 1259 (11th Cir. 2001) (internal citations and quotations omitted). Notably, "[t]he similarity between comparators and the seriousness of their respective offenses must be clearly established in order to be meaningful." *Lightner v. City of Wilmington*, 545 F.3d 260, 265 (4th Cir. 2008); *see also Mitchell*, 964 F.2d at 583.

Although we typically frame the issue whether two individuals are similarly situated as a fact question, this does not preclude a court from deciding as a matter of law that there is an insufficient basis for comparison to submit the question to the fact-finder. *See, e.g., Riggs v. Airtran Airways, Inc*., 497 F.3d 1108, 1117 (10th Cir. 2007) ("[T]he court acts as a gatekeeper, granting judgment as a matter of law unless the plaintiff has adduced relevant and probative evidence sufficient to support a jury verdict in his or her favor. This does not require a factual finding, nor does it abridge the Seventh Amendment jury trial right."); *George v. Leavitt*, 407 F.3d 405, 414 (D.C. Cir. 2005) (noting that whether comparators are similarly situated is typically a fact question).

III.

12

The City argues that the district court erred in denying its motion for judgment as a matter of law because Aquino was not a valid comparator. According to the City, Tinsley and Aquino were not similarly situated because they did not engage in the same misconduct, did not have comparable disciplinary histories, and did not have the same supervisor. Based on these disparities, the City asserts that, as a matter of law, Tinsley presented insufficient evidence of sex discrimination.

In response, Tinsley contends that he proved sex discrimination by comparing his and Aquino's records and the City's treatment of their various incidents of misconduct.[3] Tinsley focuses his argument on an assertion that he was fired for misconduct relating to the rape investigation and the parties' sexual relationship, while Aquino engaged in similar misconduct and was treated differently. According to Tinsley, he was terminated for his alleged lack of candor, while Aquino was not punished for her failure of candor during the investigation.[4] He also alleges that Aquino gave false testimony to Internal Affairs regarding the alleged rape, and that Internal Affairs knew of her false testimony but refused to investigate it. We disagree with Tinsley's arguments.

---

[3] In his response brief, Tinsley references additional members of the Department who he contends received more favorable treatment. However, on a motion for summary judgment, the district court rejected any other comparators offered by Tinsley on the sex discrimination claim, and Tinsley does not cross-appeal that decision.

[4] The dissent essentially frames the misconduct in this case as officers' misuse of equipment. However, this case arose from a rape investigation that led to peripheral issues of misuse of equipment that were discovered during the rape investigation. Moreover, based on the rape investigation, Tinsley was charged with lack of candor involving the rape charge and Aquino was not.

13

IV.

Our review of the record establishes that Tinsley and Aquino were not similarly situated because they were not "engaged in the same conduct" yet treated dissimilarly by the Department.[5] *Haynes*, 922 F.3d at 223-24. As an initial matter, we reject Tinsley's suggestion that he and Aquino were similarly situated because both parties were involved in the Internal Affairs investigation of the rape allegation. Tinsley and Aquino were not investigated by Internal Affairs for the same misconduct. The subject of the investigation was Aquino's allegation of rape made against Tinsley. Thus, at the time of the Internal Affairs investigation, Aquino was the alleged victim and was not under investigation for any misconduct arising from the parties' relationship.

Nor were Tinsley and Aquino similarly situated because they were engaged in a sexual relationship before Tinsley was fired. Their relationship was not prohibited under the Department's policies, and neither party was disciplined on that basis. Accordingly, the sexual relationship does not weigh against either Tinsley or Aquino in our comparator analysis.

---

[5] In referencing the facts underlying the City's disciplinary decisions, the dissent essentially disputes the merits of the City's various disciplinary decisions regarding Tinsley's misconduct. However, that is not our task on appellate review of the legal question whether Aquino was a valid comparator. Instead, we must determine whether the evidence supports a determination that Tinsley's misconduct for which he was fired was comparable to Aquino's misconduct. Only if the answer to that question is yes, could the fact-finder be asked to decide whether Tinsley was punished more severely for that misconduct than someone outside his protected class. *See Haynes*, 922 F.3d at 223-24.

14

Instead, in examining the record, we focus our analysis on the questions: (1) whether the rape investigation revealed comparable misconduct on the part of Tinsley and Aquino; (2) whether the cited reasons for which Tinsley was fired involved similar conduct by Aquino for which she was treated more favorably; (3) whether Tinsley and Aquino had comparable disciplinary histories; and (4) whether the Department's system of progressive discipline affects the comparator question before us. *See Lewis*, 918 F.3d at 1227-28; *Hoyle*, 650 F.3d at 336-37. We conclude that the record shows that Aquino did not engage in similar misconduct arising from the rape investigation, that Tinsley's firing was not based on comparable acts of misconduct in which Aquino also engaged, and that the parties' very different acts of misconduct over their years of service, as reflected in their disciplinary histories and the City's system of progressive discipline, render any attempted comparison of their very different disciplinary histories one of "apples to oranges" and, thus, legally insufficient. *Silvera*, 244 F.3d at 1259; *see, e.g., Cook v. CSX Transp. Corp.*, 988 F.2d 507, 511-12 (4th Cir. 1993) (noting disciplinary histories are relevant to the comparator analysis); *Lee v. Kan. City S. Ry. Co.*, 574 F.3d 253, 261 (5th Cir. 2009) (explaining the comparators' histories do not need to be identical but they need to be comparable); *Amrhein v. Health Care Serv. Corp.*, 546 F.3d 854, 860 (7th Cir. 2008) ("Without a similar disciplinary history, [the proposed comparator] cannot be considered similarly situated.").

*Tinsley's and Aquino's Conduct Relating to the Rape Investigation*

Tinsley argues that Aquino was a valid comparator because she was treated more favorably in not being disciplined for her alleged lack of candor during the rape

15

investigation.[6] He strongly suggests that Aquino's telephone call with another person during the time window of the alleged rape, and her failure to mention that call to Sergeant Burke before her cell phone records were examined, are evidence that she had lacked candor and likely was lying about having been raped. This argument fails, however, because it rests on the unsupported assertion that Aquino withheld information involving her contact *with Tinsley* that night and lied about the events that occurred between her and Tinsley.

Moreover, unlike Tinsley, Aquino was never accused of having been untruthful about the alleged rape. After investigating the alleged rape, Sergeant Burke initiated charges against Tinsley for sexual assault and referred the charges to the CCRB for adjudication. Major Jennings testified at trial that the CCRB did not conclude that Aquino was untruthful about the alleged rape. In fact, as noted above, the four members of the

---

[6] Tinsley also suggests that the Department treated Aquino more favorably by paying for her lawyer in the slander case and by entering into an agreement settling the case, while he was terminated for lack of candor. However, as noted above, Tinsley was *not* terminated for his lack of candor in the rape investigation. Those charges were disposed of with a 240-hour suspension. Tinsley was fired later based on the church parking lot incident and his misuse of equipment, which offenses were considered in conjunction with his prior disciplinary record.

Moreover, the slander case was concluded by settlement agreement in July 2016, two years after the Department terminated Tinsley's employment. "The relevance of post-termination evidence in a Title VII case depends on the nature of the evidence, the purpose for which it is offered, and the context in which it arises." *Bowie v. Maddox*, 642 F.3d 1122, 1134 (D.C. Cir. 2011); *see also Ansell v. Green Acres Contracting Co.*, 347 F.3d 515, 524 (3d Cir. 2003). While the City's decision to retain counsel for Aquino may have suggested that the City accepted Aquino's version of the events, the City's entry into the settlement agreement is not material to the issue whether it discriminated against Tinsley two years earlier when his employment was terminated.

CCRB other than Major Jennings who heard evidence of the rape charge would have sustained the charge but for Major Jennings' overriding decision that the evidence was insufficient. Additionally, Captain Maglione, who supervised the Internal Affairs investigators conducting the rape investigation, testified at trial that she did not think Aquino was misrepresenting the facts.

In contrast, Sergeant Burke testified at trial that Tinsley admitted to having consensual sexual intercourse with Aquino on the night of the alleged rape, before denying at trial that he had a sexual encounter with her that night. And although Tinsley denied having made this admission to Sergeant Burke, multiple individuals testified at trial that, during the internal rape investigation, Tinsley had reported having consensual sexual intercourse that night with Aquino. Also, Captain Maglione testified that Tinsley had given her "three different stories" about the sexual encounter with Aquino. Thus, Tinsley's record regarding lack of candor related to the rape investigation was materially distinct from Aquino's record. And, as noted above, the corroborated evidence of Tinsley's lack of candor during the rape investigation resulted in a 240-hour suspension for this misconduct.

*Tinsley's Misconduct Forming the Basis of His Termination*

Importantly, the cited bases for Tinsley's termination did not involve his lack of candor during the rape investigation. *See supra* note 6. Instead, Tinsley was cited for termination based on the four cell phone record charges detailed above and the three charges involving the church parking lot incident. As previously noted, the church parking lot incident involved Tinsley's off-duty confrontation with a parking lot attendant who

17

planned to give Tinsley a ticket for improperly parking his vehicle on private property. The City concluded that during that incident, Tinsley invoked his position as a police officer, demanding that the attendant's supervisor void the ticket. In contrast, Aquino's disciplinary record did not contain any entries indicating that she confronted a private citizen demanding special treatment because she was a police officer.

The Department's system of progressive discipline also was a factor in the Department's decision to fire Tinsley. Under that system, an officer's past disciplinary history is considered in determining the appropriate action to be taken on sustained charges of new misconduct. Tinsley had an extensive record of misconduct over the years, the most recent of which involved his 240-hour suspension for the City's determination that he lacked candor during the rape investigation. Chief Monroe testified at the Civil Service Board hearing that he would have "no use" for Tinsley's further services because of Tinsley's dishonesty. Additionally, one of the seven sustained charges for which Tinsley was recommended for termination, involving whether the improperly conducted DMV query was obtained in printed form, was related to his lack of candor. In contrast, Aquino's disciplinary record based on the examination of her cell phone records did not include any charge involving lack of candor.

*Tinsley's and Aquino's Disciplinary Histories*

Tinsley's disciplinary record included an earlier sustained instance of misconduct involving untruthfulness. In 2003, Tinsley received a neglect of duty charge for telling his supervisor that he was meeting with Deputy Chief Neal Wright, but it later came to light that he had not met with Wright. His supervisor's notes included that when he asked

18

Tinsley why he had lied, Tinsley told him a different story. Tinsley continued to be untruthful about this incident when he defended his conduct at trial, and the district court observed that Tinsley had misstated the evidence.

In contrast, Aquino's disciplinary record does not show repeated acts of misconduct for untruthfulness. Her documented misconduct was markedly different from that of Tinsley, both quantitatively and qualitatively. Because of her very different misconduct and her fewer violations, Aquino's record of misconduct was not comparable to Tinsley's record for purposes of this Title VII case. *See Lewis*, 918 F.3d at 1227-28 (noting comparators should have engaged in the same basic misconduct and share a similar disciplinary history); *Cook*, 988 F.2d at 511-12. Prior to the rape investigation, Aquino had three disciplinary violations from the date of her hiring in 2009 through May 2013. Those violations were for her involvement in a preventable accident, her need to improve her situational awareness, and her conduct in engaging in a non-justified pursuit.

After the review of her cell phone records during the rape investigation, Aquino also accrued charges for misuse of department equipment, for violation of the rules for using department equipment, and for intervention in another officer's investigation. She received a 40-hour active suspension without pay for those sustained charges. Aquino likewise accrued sustained charges in August 2013 for an incident in which she was found outside of her district and refused to obey her supervisor's command to stay in her district and to return certain evidence to property control. Based on this misconduct, charges were sustained for (i) insubordination, (ii) failure to obey her chain of command, (iii) neglect of

19

duty, and (iv) failing to properly submit property in accordance with the Department's procedures. For these incidents of misconduct, Aquino received a 120-hour suspension.

Tinsley, by contrast, had a longer history of mostly different disciplinary issues, which began in the year after he joined the Department in 1998. Between 1999 and 2012, Tinsley was cited or reprimanded 13 times either for not reporting to work or for being late for work. During the same period, Tinsley was disciplined or counseled twice for failing to appear in court to testify as required and once for failing to appear for training.

Tinsley further received reprimands for "arbitrary profiling" in improperly completing data entries for his traffic stops, for his involvement in a preventable car accident, for failing to search a building thoroughly, for failing to secure a prisoner, for failing to complete a missing person's report, for being found out of his district, for intervening in the investigation of another officer, and for being rude and unprofessional toward a robbery victim. Tinsley also received citations or counseling for leaving his post without permission, for being at home when he should be on duty, and for failing to report for a light-duty assignment. And, notably, based on his lack of candor during the rape investigation, Tinsley received two rule of conduct violations resulting in the 240-hour suspension. That extended period of suspension for lack of candor occurred just one month before the CCRB issued the recommendation for termination.

*Effect of Progressive Discipline System on Comparator Issue*

As described above, under the Department's progressive system of discipline, employees receive increasingly severe discipline upon the accrual of more infractions. Thus, officers will receive more severe sanctions for sustained findings of misconduct

20

based on such additional infractions. As a result of this system, Tinsley's more extensive disciplinary history subjected him to greater penalties for his misconduct. Major Lester testified at trial that when the CCRB looked at Tinsley's entire record, in conjunction with the progressive discipline policy and the fact that Tinsley already was serving a 240-hour suspension for his lack of candor during the rape investigation, the CCRB concluded "that there was no other recourse but to cite him for termination."

In such a system of progressive discipline, comparator status thus will depend in part on the plaintiff and the putative comparator having similar records of misconduct, both in number and in nature. *See Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 689-91 (7th Cir. 2007). In the present case, as recounted above, Aquino's disciplinary record did not meet either comparative consideration.

V.

For all these reasons, we conclude as a matter of law that Aquino, who did not have Tinsley's record for repeated lack of candor, who had fewer and far different disciplinary infractions than Tinsley, and who was not subject to the same degree of progressive discipline due to her fewer incidents of sustained misconduct, was not a valid comparator on the sex discrimination claim. To satisfy his burden at trial, Tinsley was required to produce either direct or circumstantial evidence of sex discrimination. *See Strothers v. City of Laurel*, 895 F.3d 317, 327 (4th Cir. 2018). He conceded at trial that he did not have direct evidence of sex discrimination, and he does not point to any such direct evidence on appeal. Rather, all of Tinsley's evidence of sex discrimination was based on a comparator

21

theory of liability. Thus, although Tinsley was not required "to point to a similarly situated comparator in order to succeed on a [sex] discrimination claim," he did not set forth any other evidence of sex discrimination. *Laing*, 703 F.3d at 720 (alteration omitted). While Tinsley disputes much of the evidence forming the basis of his discipline, without a comparator, there is no evidence providing a causal link between his termination and his sex.

We therefore conclude that, without a comparator, the evidence Tinsley presented was legally insufficient to support a finding of sex discrimination under Title VII, and that the district court erred in failing to grant the City's motions for judgment as a matter of law.[7] Accordingly, we must vacate the jury verdict and remand for entry of judgment in favor of the City.

Because the City's motions for judgment as a matter of law should have been granted, we also must reverse the district court's award of back pay, front pay, income tax offset, and attorneys' fees and costs. Those awards were predicated on the district court's erroneous finding that Tinsley had established Aquino as a valid comparator to prove that his employment was terminated because of his sex.

VI.

---

[7] Because, as a matter of law, Aquino did not engage in sufficiently similar misconduct conduct as Tinsley for purposes of establishing her as a valid comparator, we need not consider the further requirement for comparator status that the plaintiff and the putative comparator have the same supervisor. *See Haynes*, 922 F.3d at 224.

Accordingly, we vacate the district court's judgment, and remand the case for entry of judgment in favor of the City.

*VACATED AND REMANDED*

GREGORY, Chief Judge, dissenting:

To understand this case, it is important to emphasize that the rape allegation was not the ground for the plaintiff's termination.[1] Instead, the Charlotte-Mecklenburg police department fired Michael Tinsley, a Black man, for lacking candor in an investigation and for violating police department rules. The jury considered all of the evidence presented at trial and determined that Tinsley's firing violated Title VII of the Civil Rights Act of 1964: It decided that he was discriminated against on the basis of his gender and awarded damages. Tinsley presented more than enough evidence at trial to support the jury's verdict and its damages award.

My colleagues' conclusion that Tinsley did not present an adequate comparator is out of step with both the law and the facts. Whether a person is an appropriate comparator is not a question to be divined solely through judicial alchemy. It is a fact-specific inquiry that—after an initial showing by the plaintiff that the two employees share enough material features to be comparable as a matter of law—is reserved for a jury of one's peers. Because the facts in the light most favorable to Tinsley amply support the jury's verdict, and because the district court did not err in ruling that Tinsley presented an appropriate comparator, I respectfully dissent.

---

[1] In closing arguments, the City's own attorney told the jury that "there was not enough evidence to even charge him administratively. . . . [I]f you think that Mr. Tinsley was disciplined because of anything related . . . to Officer Aquino, he wasn't. He was not suspended for the rape allegation. He was not disciplined for the rape allegation, nothing happened to him because of that rape allegation." J.A. PDF 812.

## I.

## A.

Tinsley and another police officer, Aimee Aquino, a white woman, were in an on-again, off-again sexual relationship for approximately two years before it ended in mid-2013. It began when the two Charlotte-Mecklenburg police officers, who were staffed in different divisions of the police department, began working off-duty security shifts at a Charlotte restaurant.[2] Before the events giving rise to this case, Tinsley and Aquino both had disciplinary histories. Although Tinsley's was lengthier, he had also been a police officer for over a decade longer than Aquino. At the time of Tinsley's firing, he was ranked first of 118 officers in his division in total production (a metric including calls for service, arrests, clearance rate, and traffic enforcement). J.A. PDF 774. There is no indication in the record that, prior to the events giving rise to this case, Tinsley was in any danger of adverse disciplinary action.

By spring 2013, Tinsley testified that he felt his relationship with Aquino had run its course. Aquino, according to Tinsley, viewed things differently. She contacted him regularly, and would push him to allow her to come over to his house at night even when he rebuffed her. She asked around for Tinsley's whereabouts and sometimes left her assigned district to find him. She showed up at places that Tinsley frequented—his gym,

---

[2] What follows are the facts as presented at trial in the light most favorable to Tinsley, giving him "the benefit of every legitimate inference in his favor." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (quoting *Abasiekong v. City of Shelby*, 744 F.2d 1055, 1059 (4th Cir. 1984)). This Court may only disregard Tinsley's evidence if it is "totally incredible on its face." *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1419 (4th Cir. 1991).

his favorite restaurant. On one occasion, she blocked in Tinsley's police car. And on two other occasions, she violated department policy by using police equipment to search for information about a woman whom she believed to be in a relationship with Tinsley. Tinsley described Aquino's behavior as stalking.

Aquino's supervisor was made aware of this behavior after Aquino showed up to the computer lab in Tinsley's division one day dressed in jeans and heels—an outfit "consistent with going out to dinner or something," according to Tinsley's supervisor, who saw her there. J.A. PDF 454. When Tinsley's supervisor asked Aquino why she was there, she replied that she was "printing papers for court," although it was a Saturday. J.A. PDF 455–56. After she left, Tinsley's supervisor contacted Aquino's supervisor. *Id.* As a result, Aquino was formally ordered to stay out of Tinsley's district on May 7, 2013. J.A. PDF 1425.

Immediately after she was given this directive, Aquino told another officer that Tinsley had raped her the previous month on a specific date and at a specific time. J.A. PDF 2145. In police department interviews, both Tinsley and Aquino acknowledged being in a consensual sexual relationship both before and after the alleged April 2013 rape. Tinsley consistently denied having sex with Aquino against her will, and Aquino's phone records indicate that Aquino was on telephone calls with another man during and after the precise time period in which she had said she was raped by Tinsley. J.A. PDF 1477. No criminal charges were ever brought against Tinsley based on Aquino's rape allegation, and the police department ultimately found the rape allegation not sustained. J.A. PDF 1355–56. Finally, prior to the federal trial in this case, a state jury found Aquino liable for slander

based on the rape allegation, resulting in a judgment in favor of Tinsley that the City satisfied. The City filed a motion in limine to exclude all evidence relating to the slander trial, verdict, and resulting payment to Tinsley, but its motion was denied. This evidence was introduced and repeatedly referenced during trial. The City did not object to this evidence, ask for an instruction limiting its use by the jury, or appeal on this basis.

**B.**

Following the rape allegation, both Tinsley and Aquino were investigated at the same time and by the same person, Sgt. Michael Burke (a supervisor, J.A. PDF 584). Burke's investigation revealed that both officers had misused equipment: Aquino had used police databases to search the name and, later, the license plate of the woman whom she suspected was romantically involved with Tinsley. Burke's investigation also revealed that Aquino had agreed, "on the down-low," to look up a Florida vehicle registration for a friend who wanted information on a neighbor. For his part, Tinsley had used police databases to find out whether a firearm that a friend was interested in purchasing had ever been reported as stolen and to discover why a relative's driver's license was suspended. Both officers also received charges for intervening in traffic-related cases. (Tinsley showed a prosecuting attorney evidence that a relative's registration was updated, and the relative's ticket for lacking up-to-date registration was subsequently dismissed. J.A. PDF 227–29. Aquino emailed an officer who had issued a ticket for reckless driving and speeding in an

27

attempt to get that officer to dismiss it.  J.A. PDF 1454–55.)  Both were subsequently cited

and disciplined for these highly similar violations.[3]

In addition, the record evinces Burke's belief that both interviewees displayed a lack

of candor in answering his questions.[4]  The evidence that Tinsley was less than forthright

during the investigation was controverted at trial.  *See, e.g.*, J.A. PDF 203; *id.* 217–18; *id.*

229–30.  (The district court judge likewise noted that "whether Plaintiff provided

contradictory [answers during the investigation] was heavily contested[.]")  The chief of

---

[3] The City also claims to have fired Tinsley in part due to a prior parking-lot incident that was only investigated after the rape allegation came to light.  Briefly:  In April 2013, Tinsley's car was nearly towed from a parking lot at the church where he regularly exercised.  Tinsley and others who were present during the incident testified at trial that the place where Tinsley parked, which was technically not marked as a parking space, was used by church regulars like Tinsley, and that Tinsley had parked there for years without incident.

According to the parking lot operator, Tinsley stood close to him and yelled to him and his supervisor about how he was a police officer and how he would make sure "everything on the street" was "legit to a T" if he received a ticket.  But other eyewitnesses to the interaction testified at trial that they did not hear Tinsley raise his voice or ever mention that he was a police officer.  In addition, Tinsley's counsel elicited evidence suggesting that the Charlotte parking lot operator's employees were predisposed to dislike Tinsley because he had enforced violations of jaywalking and parking laws by the company's valets.

This incident was "combined for action" with Tinsley's lack of candor, intervention, and misuse of equipment charges, and thus Tinsley was technically recommended for termination for this incident.  Drawing all inferences in favor of Tinsley, a reasonable juror could conclude that the incident did not in fact play any role in Tinsley's dismissal.

[4] The majority assumes (at 16 n.7) that when discussing Aquino's lack of candor, I am referring to Aquino relaying the rape allegation.  I am not.  As explained below, Burke's investigation established that, in two separate interviews, Aquino gave elaborate and shifting explanations for her repeated misuse of departmental equipment that were inconsistent.

28

police recommended Tinsley for firing because the department determined that he lacked candor during the investigation, specifically in the way that he answered questions. J.A. PDF 783–84. But Tinsley's evidence was that he was not dishonest in responding to investigators' questions about either the rape or his misuse of departmental equipment. He testified that he was merely responding to differently-worded questions asked of him at different times.

Aquino did not testify at trial, but jurors listened to the recorded audio of two interviews she gave to Burke. Ex. 51, Ex. 86. Over the course of the two interviews, Aquino's explanations for her violations of police department policy vary dramatically, to Burke's rising consternation. Burke asked Aquino repeatedly about her use of police equipment to conduct searches of a woman whom she believed to be romantically involved with Tinsley. Aquino described a random encounter in which she was out on duty one day—tracking suspects in the parking lot of a pharmacy where the woman just happened to work—when she decided to run all of the plates in the lot and the woman's name popped up. In fact, a month before she ran the woman's plates, Aquino had used police equipment to search the woman by name, and at that time she was already familiar with the woman from social media. Moreover, she had not in fact run any other license plates in the pharmacy parking lot.

In the second interview, where Burke asked her to explain her inconsistent answers, Aquino continued to insist that she ran more than one license plate in the pharmacy parking lot, and also stated that she did not remember exactly what happened. She explained her shifting story by stating that, "with time away" from the pharmacy incident, she

29

remembered what had happened more accurately, though still not completely. When Burke repeatedly questioned Aquino about her inconsistencies, she continued to assert that she was not being dishonest in the first interview and that she did not have "perfect memory." Aquino variously admitted some of her conduct, denied some of her conduct, and denied having changed her story. In the audio of the second interview, Burke notes the marked differences between Aquino's answers in her first interview and those in her second, and advises her to be more forthcoming:

> [T]he important part . . . is that things don't come across as if you're not being honest, okay? So when you say you don't recall some things and you do recall other things, when—and just for example . . . when I asked you [in the first interview] about the parking lot, you didn't hesitate and say, 'you know, I just really don't know for sure that day.' You came off and you said, 'I ran every tag in that parking lot to find out who that was.' And that wasn't, like, a recall thing. That was—boom. That was—immediate response.

Ex. 86.

Nonetheless, a resulting report stated that Aquino "admitted" her misconduct. She was neither charged with nor disciplined for lack of candor. Tinsley, on the other hand, was fired. Before the Civil Service Board, Chief of Police Rodney Monroe made clear why he recommended that Tinsley be terminated:

> We've been made aware and we've seen similar cases whereby an officer has . . . not shown truthfulness and has received discipline as it relates specifically to truthfulness, that their testimony in court is no longer allowed. Hence, that officer is no longer a valuable asset to this organization. When they can't testify in the court on behalf of our citizens, in the crimes committed against our citizens, then they have no use within this organization. . . . [O]ur business is about trust.

J.A. PDF 1991.

30

## II.

Title VII prohibits an employer from "discharg[ing] any individual, or otherwise . . . discriminat[ing] against any individual with respect to his compensation, terms, conditions, or privileges of employment" on the basis of race or gender. 42 U.S.C. § 2000e–2(a)(1). When a plaintiff lacks direct evidence of discrimination, she may prove her case inferentially by presenting evidence that an appropriate comparator—a person of a different race or gender in the same or similar situation—was treated more favorably. In support of its claim that this Court should overturn the jury's verdict, the City argues only that Tinsley did not present an appropriate comparator. My colleagues agree, concluding as a matter of law that Tinsley's proffered comparator, Aimee Aquino, could not be the basis for a jury's finding of inferential discrimination. This conclusion is wrong.

To begin with, it is not clear to me that this Court should apply a rigorous comparator analysis in this procedural posture. The burden-shifting framework in *McDonnell Douglas Corporation v. Green*, 411 U.S. 792 (1973), "is inapposite when a trial has proceeded to completion," *Dennis v. Columbia Colleton Med. Ctr., Inc.*, 290 F.3d 639, 645 (4th Cir. 2002), and this Court's task is instead to determine whether sufficient evidence supports the verdict. If no credible facts adduced at trial support the jury's conclusion that an employer's treatment of a proffered comparator established an inference of discrimination, this Court would appropriately overturn the jury verdict. Otherwise, as I note below, it must affirm.

The majority decides that differences in disciplinary history and length of service may foreclose comparison at the prima facie stage even in a situation like this one, where

31

other (more relevant) facts offer sufficient bases for material comparison between two similarly-situated employees. This conclusion undermines the protections of Title VII.

The comparator test is not a rigid one. The Supreme Court in *McDonnell Douglas* noted only that a comparator's conduct should be of "comparable seriousness." 411 U.S. at 804. The parties agree on appeal that an appropriate comparator must be similar to the plaintiff in all relevant respects. However the similarly-situated requirement is phrased, it is meant to be "flexible, common-sense, and factual." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).

The City principally argues that Tinsley and Aquino are not comparable because they did not share a supervisor and because their disciplinary histories differed. In inferential discrimination cases, evidence that a shared supervisor or decisionmaker treated employees differently for committing the same type of misconduct is highly useful. A common decisionmaker helps jurors evaluate whether discrimination in fact occurred—in other words, it may help establish that the reasons given for a firing were pretextual. In this case, Burke—the sole investigator for both Tinsley and Aquino—fulfills the same function.

In one recent inferential discrimination case, we required plaintiffs to "share the same supervisor," among other things. *Haynes v. Waste Connections, Inc.*, 922 F.3d 219, 223–24 (4th Cir. 2019) (relying on *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)). But that requirement (as the progeny of *Mitchell* have long noted) "does not automatically apply in every case" and is not a bar to relief in a case like this one, where the comparators are otherwise similar in "all relevant respects." *See McMillan v. Castro*,

32

405 F.3d 405, 414 (6th Cir. 2005); *see also Louzon v. Ford Motor Co.*, 718 F.3d 556, 563 (6th Cir. 2013); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (same-supervisor requirement does not apply to all factual situations; rather, comparators must be similar in "relevant aspects"); *Hawn v. Exec. Jet Mgmt., Inc.*, 615 F.3d 1151, 1157 (9th Cir. 2010) (finding that imposing a strict same-supervisor requirement in an ill-fitting case was error; instead, comparators must be similar "in all material respects"); *cf. Eaton v. Dep't of Corr.*, 657 F.3d 551, 556 (7th Cir. 2011) (stating that a comparator sharing the same supervisor is only "generally" required and noting that the similarly-situated requirement "ought not be construed so rigidly or inflexibly that it [becomes] a useless analytical tool" (quoting *South v. Ill. Env't Prot. Agency*, 495 F.3d 747, 751 (7th Cir. 2007)); *Graham v. Long Island R.R.*, 230 F.3d 34, 40 (2d Cir. 2000) ("[T]he standard for comparing conduct requires a reasonably close resemblance of the facts and circumstances of plaintiff's and comparator's cases, rather than a showing that both cases are identical."). Here, that similarity is grounded in lack of candor, intervention, and misuse of equipment, all of which were part of the investigation of both employees conducted by the same investigator.

The majority's comparator analysis is not to the contrary. However, the majority concludes that we should ignore these similarities because at the outset of the investigation, Tinsley stood accused of rape, while Aquino was the one who accused him. But the City did not base Tinsley's firing on the rape allegation.

Rather, the City claims to have fired Tinsley based on intervention, misuse of equipment, and lack of candor in the investigation. Given the City's grounds for Tinsley's

33

firing and the many remaining similarities between Tinsley and Aquino, it was appropriate to allow a jury to determine whether the City discriminated against Tinsley in firing him.

In concluding that the rape allegation thwarts comparison, the majority's analysis sidesteps the facts of this case. Tinsley was never criminally investigated nor charged for the alleged rape; the police department did not offer this as the reason for treating Tinsley and Aquino differently nor for firing Tinsley; and the police department itself did not sustain the rape allegation. J.A. PDF 1355–56. In short, the difference on which the majority hangs its hat is that Tinsley was accused of an unsubstantiated violation. Yet there is no authority for holding that Aquino cannot be a valid comparator on this basis. Both Aquino and Tinsley were investigated by the same person and later disciplined for similar conduct, which is all that is required for a case like this one to proceed to a jury verdict. The alternative rule would require that a comparator be identically, not similarly, situated to a plaintiff. In other words, because few (if any) two employees' records or conduct are exactly alike, the majority's rule would make it extremely difficult for anyone to provide evidence of a comparator.

Since this case ultimately concerns discipline relating to conduct much less serious than rape or sexual assault, it is appropriate to consider Tinsley's and Aquino's conduct to be of "comparable seriousness." *McDonnell Douglas*, 411 U.S. at 804. The City's (and the majority's) remaining explanations for Tinsley's firing and Aquino's retention—that Tinsley and Aquino had different disciplinary histories prior to the relevant investigation and that the department claims to have meted out discipline in this case progressively—are questions of fact ideally suited for resolution by a jury. Indeed, had Tinsley and Aquino

34

both been investigated by Burke for the same violations as here, but had never met, Aquino would certainly be an appropriate comparator. That is enough to decide this case.

The majority nonetheless concludes, over the jury's verdict to the contrary, that Tinsley's and Aquino's varying disciplinary histories preclude comparison in this case. I agree with my colleagues that the evidence of Aquino's and Tinsley's differing disciplinary histories is relevant to the factfinder in assessing whether Tinsley was fired for a legitimate (rather than discriminatory) reason. But I cannot agree—in viewing this record, as we must, in the light most favorable to Tinsley—that progressive discipline or disciplinary history alone certainly caused Tinsley's firing.

This Court's sole task in a case like this one is to determine whether there is support for the trier of fact's decision. *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000). In doing so, this Court does not pick and choose facts from the record and ask whether they might have led the jury to a different verdict. We do not "retry factual findings or credibility determinations reached by the jury." *Cline v. Wal-Mart Stores, Inc.*, 144 F.3d 294, 301 (4th Cir. 1998) (citing *Duke v. Uniroyal, Inc.*, 928 F.2d 1413, 1419 (4th Cir. 1991)). Instead, we "giv[e] [the non-movant] the benefit of every legitimate inference in his favor." *Cline*, 144 F.3d at 301 (quoting *Abasiekong v. City of Shelby*, 744 F.2d 1055, 1059 (4th Cir. 1984)). "[W]e act clinically in marshalling the evidence presented in favor of plaintiffs and disregard the substance of evidence offered by" the nonmoving party. *Duke*, 928 F.3d at 1419. And if "there was evidence upon which a jury could reasonably return a verdict for him," we affirm. *Cline*, 144 F.3d at 301 (quoting *Abasiekong*, 744 F.2d at 1059).

35

That Tinsley's record was lengthier than Aquino's informed much of the City's strategy at trial. But Tinsley responded that the City did not rely on its usual disciplinary procedures or policies in disciplining either him or Aquino. As explained above, he presented sufficient evidence to allow the jury to conclude that the City's primary reason for firing him—his lack of candor—was pretextual. *See* Part I.B. *supra*. Meanwhile, the City ignored comparable conduct by Aquino and its impact on her utility as a police officer.[5]

The jury's verdict indicates that it believed Tinsley's explanation for these actions, not the City's. It is not for this Court to reverse the jury's decision based on its alternate reading of the evidence. Nor did the district court, which also heard the evidence firsthand, abuse its discretion or otherwise err in denying the City's motions for judgment as a matter of law. This Court should not upend those determinations.

## III.

I would also affirm the district court's awards of back pay, front pay, and attorney's fees. This Court reviews such awards for abuse of discretion. *See EEOC v. Consol Energy, Inc.*, 860 F.3d 131, 148 (4th Cir. 2017); *EEOC v. Great Steaks, Inc.*, 667 F.3d 510, 516 (4th Cir. 2012). A plaintiff who prevails on a Title VII claim is ordinarily entitled to

---

[5] Based on both the jury verdict in the slander trial and a prior disciplinary infraction of Aquino's in which she falsely recorded her location, the district attorney sent the police chief a letter noting that prosecutors would "no longer be able to call Officer Aquino as a police witness for the State of North Carolina" in traffic or criminal cases. J.A. PDF 236, 1446. Although the department fired Tinsley for ostensibly the same problem—an inability to be a witness in court—it continued to employ Aquino.

attorney's fees. *Albemarle Paper Co. v. Moody*, 422 U.S. 405, 414–16 (1975). With this backdrop, the City argues only that Tinsley was awarded excessive back pay. Specifically, the City argues that Tinsley failed to mitigate his damages. It is the City's burden to refute Tinsley's evidence on mitigation. *Consol Energy*, 860 F.3d at 148.

The record reflects that Tinsley took multiple steps to mitigate his damages. In addition to searching and inquiring about other jobs, he worked for Lowe's; detailed cars at the airport; went back to school to attempt to start a car detail business; and worked for a temp agency as a heavy equipment operator. The district court found this testimony credible. It awarded Tinsley back pay based on the amount he would have earned had he continued work as a police officer; subtracted the amount of money he did in fact earn; and adjusted the amount to present-day value, adding pre-judgment interest under North Carolina law. The City does not challenge this calculation; it only challenges the district court's credibility determination regarding mitigation. This is a finding of fact reviewable only for clear error. *Consol Energy*, 860 F.3d at 148–49 ("[W]hether a worker acted reasonably in accepting particular employment is preeminently a question of fact.") The City does not argue that the district court clearly erred in making its credibility determination or cite any law tending to support its position on back pay. Therefore, I would affirm the district court's award of back pay.

The City next argues that the district court abused its discretion in awarding Tinsley front pay. This award, too, is reviewed for abuse of discretion. *Consol Energy*, 860 F.3d at 148. The City first argues that it offered Tinsley reinstatement, but because this offer was conditional, Tinsley was not required to accept it. *See Ford Motor Co. v. EEOC*, 458

37

U.S. 219, 234 (1982) (requiring employees to accept unconditional offers of reinstatement to mitigate damages). The district court did not abuse its discretion in further concluding that reinstatement was not feasible based on the circumstances of this case. I would accordingly affirm the district court's decision not to order it.

According to the City, Tinsley's front-pay award was a windfall because the amount awarded in front and back pay ($1,329,030) was greater than the amount the jury awarded the plaintiff for his injury in suffering the discrimination itself ($125,000). The City cites no law for this definition of a windfall. A windfall is "an unanticipated benefit, usually in the form of a profit." *Windfall*, Black's Law Dictionary (11th ed. 2019). But Tinsley did not profit from the district court's award of front and back pay. Rather, its front and back pay awards were reasonably calculated, consistent with the aims of Title VII, to make Tinsley whole. *See Albemarle*, 422 U.S. at 421–23. The City correctly notes that, in awarding front pay, a district court should "temper[]" an award so as to mitigate the potential for a windfall for the plaintiff. *Duke*, 928 F.2d at 1424. The district court ensured that Tinsley did not receive a windfall here by making its calculation after considering Tinsley's age; his time until retirement (eight years, which the district court determined was neutral); his length of time employed (15 years, which weighed in favor of front pay); his mitigation and ability to obtain other jobs (obtaining a comparable job was very difficult, weighing in favor); and his intent to have remained in his job as a police officer (high, weighing in favor). It then calculated the front pay period based on Tinsley's estimated time until retirement. The district court then determined the amount Tinsley would have made as a police officer and as a heavy equipment operator, subtracted the

38

latter from the former, and adjusted the number to present-day value. I would affirm this calculation.

Finally, I would affirm the district court's award of attorney's fees. As the City notes, "[p]revailing plaintiffs in Title VII actions ordinarily are entitled to attorneys' fees unless special circumstances militate against such an award." *Christianburg Garment v. EEOC*, 434 U.S. 412, 417 (1978). I would find no such special circumstances here. The City first requests that this Court reduce the attorney's fees awarded by the district court based on the jury awarding relief on some, but not all, of the plaintiff's legal theories. But "[w]here a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation . . . . In [such] circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit." *Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). I would hold that the district court did not abuse its discretion in applying *Hensley* to this case, where the facts, evidence, and argument related to both claims almost entirely overlapped.

The City finally objects to the attorney's billing practices, noting the attorney's "block billing in certain entries," but neither lists those entries nor cites any binding law pointing this Court to authority regarding block billing. The plaintiff's attorney did in some circumstances bill for multiple items in one entry, but those items appear generally related and extend over relatively short time periods—for example, 3.8 hours for "[m]eeting with client for hearing; preparation and review of documents and witness identification; witness list submission; telephone calls to witnesses; prepare for hearing." The district court

39

correctly noted that while block billing is a "dangerous proposition," the City had not pointed to any specific problematic entries, and indeed found none on its own review. The record supports that determination. Thus, I would affirm the attorney's fee award.

## IV.

Because the record in this case supports the jury's determination that the City of Charlotte discriminated against Tinsley in firing him—and because Aquino was an appropriate comparator—I would affirm the jury's verdict. I would likewise affirm the district court's award of front pay, back pay, and attorney's fees.